Bessie O'HARE et al., Plaintiffs,

v.

Damon H. PURSELL and Damon H. Pursell Construction Co., Inc. (Third-Party Plaintiffs), Respondents

(Missouri Union Insurance Company, a Missouri corporation [Third-Party Defendant], Appellant).

No. 46934.

Supreme Court of Missouri,

Division No. 1.

Nov. 9, 1959.

Motion for Rehearing or to Transfer to Court en Banc Denied Dec. 14, 1959.

Goldenhersh, Goldenhersh, Koebel &
Gallagher, St. Louis, C. William Garver,

Kansas City, Melvin L. Hertzman, St. Louis, of counsel, for appellant.

Sevier & Turnage, Robert F. Sevier, William E. Turnage, Liberty, for respondents.

HOUSER, Commissioner.

This is a third-party proceeding in which Damon H. Pursell and Damon H. Pursell Construction Company, Inc., as third-party plaintiffs, sought to enforce their rights under a policy of public liability insurance issued to them by Insurance Company of Texas, a Texas corporation (hereinafter "I.C.T."), and under a treaty of reinsurance between I.C.T. and its reinsurer. Third-party plaintiffs sued for $15,516.97 paid by them to judgment creditors in satisfaction of judgments and court costs rendered against them. Third-party defendant is Missouri Union Insurance Company, a Missouri corporation (hereinafter "Missouri Union"), the reinsurer of I.C.T. under the treaty of reinsurance. Following a trial by the court without a jury the Circuit Court of Clay County rendered judgment for third-party plaintiffs and against third-party defendant for $15,516.97, and the latter has appealed.

Damon H. Pursell is an individual, a resident of Clay County. Damon H. Pursell Construction Company, Inc., is a Missouri corporation with offices in Clay County. They will be referred to as "the insureds." On February 21, 1955, I.C.T. issued a policy of public liability insurance to the insureds, with limits of $100,-000/200,000 for each accident, covering automobiles, trucks and machinery they operated. During the policy period, and on May 1, 1955, a motor vehicle thus insured, operated by Pursell for the construction company, was involved in an accident. Report of the accident was made to I.C.T., which employed a local attorney, Stephen R. Pratt, to handle the claims. Pratt investigated the case, arranged for medical examinations of the injured claimants, conferred with claimants' attorney and reported to I.C.T. Thereafter and on September 30, 1955, I.C.T. and Missouri Union simultaneously entered into two written contracts: a "Treaty of Reinsurance" and a "Retrocession and Quota Share Agreement of Reinsurance."

Treaty of Reinsurance

By this instrument I.C.T. as the ceding company and Missouri Union as the reinsurer, expressing the intent of the parties "that the ceding company shall cede to the reinsurer, one hundred percent (100%) of all policy liability of whatever nature now in force written through agents in the State of Missouri, or issued after the effective date of this Treaty," agreed as follows: The ceding company ceded and the reinsurer accepted and reinsured as of midnight, September 30, 1955, "one hundred percent (100%) of the ceding company's policy liability under all policies written by the ceding company on risks written through agents in the State of Missouri" in force on that day, and 100% of the ceding company's loss reserve on the same risks outstanding as of that date. The contract recited that the loss reserve amounted to approximately $290,000. Reinsurer further agreed "that as a part of said one hundred percent (100%) reinsurance and take over of loss reserve * * * the reinsurer will service, adjust and settle obligations directly with the insureds whose policies are reinsured hereunder and whose losses occurred prior to September 30, 1955." The agreed premium payable for the reinsurance was 100% of the unearned premium reserve of the ceding company on said risks as of midnight, September 30, 1955, less a discount on said reserves of 40% thereof. In consideration of the 100% reinsurance of liability by the reinsurer the ceding company agreed "to turn over to said reinsurer all records, books, papers and statistical information pertaining to the operation of the business and from and after midnight, September 30, 1955, the reinsurer shall, as reinsurer hereunder, service and handle all policies and obligations to insureds which are reinsured hereunder, and the ceding company agrees that the reinsurer may settle

all obligation and claims in this connection in such manner as it may deem necessary and at its discretion and that it may commence, defend, compromise or withdraw from action, suits, or prosecutions, and in general do all things that it may deem expedient in connection with its servicing and handling the business reinsured." Reinsurer agreed "to exercise the highest faith and trust in connection with handling the affairs and obligations of the ceding company so as to preserve and enhance the reputation of said ceding company with the insuring public." Reinsurer agreed "that the reinsurance hereunder shall be payable by the reinsurer on the basis of the liabilities of the ceding company under contract or contracts reinsured without diminution because of any insolvency of the ceding company." In the event of insolvency of the ceding company it was agreed that reinsurer might investigate and defend claims made against the ceding company with respect to the policies insured. Any reinsurance payable to the ceding company, after the insolvency of the ceding company, should be paid "for the benefit of those policies" reinsured, and should "not be for the benefit of general creditors of the ceding company. Provided, however, that in the event of an action by the insured directly against the reinsurer or by a receivor of the ceding company against the reinsurer for the use and benefit of the insured," the reinsurer should be entitled to all set-offs and counterclaims that it would have been entitled to against the ceding company had the ceding company been solvent and had it brought the action in its own name and for its own benefit. It was provided that the reinsurance attach automatically, and reinsurers' liability was "based upon the same terms and conditions as those of the policies of the ceding company."

### Retrocession and Quota Share Agreement of Reinsurance

By this instrument Missouri Union as the ceding company retroceded and I.C.T. as the reinsurer agreed to accept a fixed share of 50% of the ceding company's business received under its Quota Share Treaty of Reinsurance with I.C.T., commencing with its treaty of September 30, 1955. The ceding company ceded and the reinsurer accepted 50% of the ceding company's retention under all policies written by the ceding company which were in force on September 30, 1955. It was provided that "The liability of the reinsurer shall follow the liability of the ceding company in accordance with the conditions of its original Reinsurance Agreement and shall be subject to the same risks, conditions and modes of settlements; it being the intent of this Agreement that the reinsurer shall in proportion to its participation follow the fortune of the ceding company in all respects under its original Reinsurance Agreement." The commission allowance on the business retroceded was fixed at 40%. The provisions relating to insolvency of the ceding company were couched in the same language as that employed in the Treaty of Reinsurance, *except* for the omission of the language found in the Treaty providing as follows: "Although the reinsurance hereunder shall be payable without diminution because of insolvency of the ceding company as provided in this article, any reinsurance payable by the reinsurer to the ceding company, after the insolvency of the ceding company, shall be paid for the benefit of those policies written through agents in the State of Missouri, and shall not be for the benefit of general creditors of the ceding company. Provided, however, that in the event of an action by the insured directly against the reinsurer or by a receivor of the ceding company against the reinsurer for the use and benefit of the insured, the reinsurer shall be entitled to assert any of the defenses available to it under Article III hereof, and shall be entitled to all set-offs and counterclaims that it would have been entitled to against the ceding company had the ceding company been solvent and had the ceding company brought the action in its own name and for its own benefit." The sums due and payable to either

party were to be deemed mutual debts and credits. The amount payable to the reinsurer under this agreement was the premium earned less the amount from insurer to ceding company.

Pursuant to the Treaty of Reinsurance Missouri Union "took over" and serviced those policies issued by I.C.T. in this state that Missouri Union was qualified to write. In early October 1955 a representative of Missouri Union in the Kansas City office told Pursell that Missouri Union had "taken over the business of ICT in the State of Missouri," and that Missouri Union would be servicing Pursell's contracts, and handling all the claims; that if the insureds had any questions about the policy or if they could not get a satisfactory answer from the local agent, the insureds should get in touch with the Missouri Union agent in Kansas City. The local agent who wrote the policy in question was Frank F. Hamer. Prior to October 1955 Hamer dealt with I.C.T. with reference to the policy. On October 7, 1955, Hamer and I.C.T. signed an agreement excluding the handling of casualty coverages for I.C.T., and a new contract was entered into between Hamer and Missouri Union for the handling of casualty business. After that date Hamer dealt with Missouri Union and not with I.C.T. with reference to the instant policy. He sent the insureds billings for premiums as they came due on the I.C.T. policy, based upon audits made by and statements issued from Missouri Union. The insureds paid these billings to Hamer who transmitted the premium payments to Missouri Union, not to I.C.T. After September 30, 1955, attorney Pratt, in the handling of the claims arising out of the accident of May 1, 1955, no longer reported to I.C.T. From that date for several months he was employed by and dealt with Missouri Union. He conferred with its representatives by telephone and exchanged letters with its vice-president in charge of claims with reference to developments, medical examinations, hospitalization of the injured persons, negotiations with claimants' attorney for settlement, limits of authority in connection with settlement offers, etc. On March 13, 1956, Missouri Union's Agency Director wrote Hamer, stating that Missouri Union "assumed" the I.C.T.'s casualty business in Missouri on September 30, 1955. In a letter to Hamer on May 14, 1956, Missouri Union referred to Damon H. Pursell as "our assured." Between February 7 and July 30, 1956, fifteen lawsuits for damages for personal injuries and loss of services resulting from the accident of May 1, 1955, were filed against the insureds in the Circuit Court of Clay County. As petitions were filed in these cases they were sent by the insureds to attorney Pratt and by him to Missouri Union. At the direction of Missouri Union Pratt filed answers and took depositions in the cases. Missouri Union settled numerous other claims made against the insureds under the I.C.T. policy, issuing Missouri Union drafts in payment of the claims of The Gas Service Company in February 1956, the Kansas City Water Department in April 1956, the Board of Public Utilities of Kansas City, Kansas, and the Southwestern Bell Telephone Company in May 1956. Missouri Union also paid a claim arising out of the insureds' blasting operations. Missouri Union corresponded directly with the insureds in March 1956 with reference to the claim of Hunts Plumbing Company. The total damages prayed for in the lawsuits arising out of the accident of May 1, 1955, exceeded the policy limits of $200,000. On September 13, 1956, Missouri Union directed attorney Pratt to advise the insureds of this situation, suggesting that if they desired they could employ counsel of their own to represent them on the excess. During this same period Missouri Union corresponded with I.C.T. with the object of establishing adequate reserves for the payment of the claims arising out of the accident of May 1, 1955. In several letters Missouri Union inquired whether I.C.T. had notified John C. Paige & Co. of Boston, the reinsurer of excess coverage, of these claims. On May 4, 1956, Missouri

Union wrote I.C.T.'s claim examiner, observing that on December 5, 1955, "you did write to John C. Paige and Company giving them a complete résumé of the file and requesting from them authorization up to $6,000.00 under their excess coverage over our $10,000.00 primary coverage," and expressing concern that there was no indication in the file that such authority from the reinsurer had been extended. In this correspondence Missouri Union referred to attorney Pratt as "our attorney." On September 27, 1956, by way of an·addendum both to the Treaty of Reinsurance and to the Retrocession and Quota Share Agreement of Reinsurance, Missouri Union and I.C.T., by mutual consent between the two companies, "cancelled" both agreements effective as of midnight, September 30, 1956. The addendum to the Treaty of Reinsurance further provided that "the unearned premium reserves as of Midnight, September 30, 1956, in respect of the outstanding liability under the ceding company's policies covered hereunder shall be paid by the reinsurers to the ceding company, less a discount of forty percent (40%), and that as from October 1, 1956, the reinsurers shall have no further liability in respect of any policies covered hereunder," and that "the reserves for outstanding losses, as of Midnight, September 30, 1956, in respect of the ceding company's policies covered hereunder, shall be paid by the reinsurers to the ceding company and that in respect of such outstanding losses the reinsurers shall have no further liability hereunder." After September 30, 1956, Missouri Union disclaimed all liability to the insureds under the policy. Sometime in the fall of 1956, as the time for trial drew near, attorney Pratt discontinued his correspondence with Missouri Union with reference to these lawsuits. Pratt resumed his contacts with I.C.T. after September 30, 1956 and on December 19, 1956, I.C.T. authorized Pratt to effect a settlement of all of the fifteen cases in the amount of $14,000, which Pratt tried to do, without success. On January 31, 1957, Pratt reported to I.C.T. the state of his nego-

tiations with the attorney for the plaintiffs and asked for authority to settle for $17,500. On February 19, 1957, Pratt wrote I.C.T. requesting advice as to the disposition of the file, he having been informed that I.C.T. had been suspended from doing business. In March 1957 I.C.T. was placed in receivership by the State of Texas. In April 1957 Pursell and the construction company filed a motion in the pending damage suits for leave to file a third-party petition · against Missouri Union. Leave having been granted, Pursell and his company filed the first amended petition against Missouri Union (the basis of this proceeding) on June 7, 1957. At the trial of the damage suits attorneys appeared, representing the insureds for the overage above $200,000. Missouri Union appeared by counsel and waived any claim against the entry of consent judgments in the original cases between the plaintiffs and the insureds. On September 23, 1957, judgments totaling $15,000 for damages and $516.97 for court costs were rendered in favor of the fifteen plaintiffs and against Pursell and the construction company. On the same day the insureds paid the judgments and costs in full. On February 12, 1958, judgment for the same total amount, $15,516.97, was rendered in favor of Pursell and the construction company against Missouri Union on the third-party petition. From that judgment this appeal is taken.

Appellant Missouri Union contends that the court erred in entering judgment in favor of the insureds and against it because (1) the insureds acquired no rights against Missouri Union under the original Treaty of Reinsurance between I.C.T. and Missouri Union; (2) that if the insureds acquired any such rights they were required to establish a contract still in effect, which they failed to do, because (3) the Treaty of Reinsurance was cancelled on September 30, 1956; (4) that if the insureds were entitled to any judgment they were not entitled to 100% of their loss from Missouri · Union but at most only 50%,

under the terms of the Retrocession and Quota Share Agreement of Reinsurance.

Attending to the first question: Did the insureds, who held a policy issued by I.C.T., acquire any right to maintain a direct action against Missouri Union, I.C.T.'s reinsurer, by reason of the terms of the Treaty of Reinsurance? Appellant takes the position that the Treaty of Reinsurance is totally distinct from and unconnected with the primitive insurance contract between the insureds and I.C.T.; that the insureds were not a party to the Treaty of Reinsurance, or in privity therewith; that the liability over of the reinsurer (Missouri Union) is exclusively and solely to the reinsured (I.C.T.) and that the insureds acquired no rights thereunder against the reinsurer.

 An ordinary contract of reinsurance, in the absence of provisions to the contrary, operates solely as between the reinsurer and the reinsured. It creates no privity between the original insured and the reinsurer. The contract of insurance and the contract of reinsurance are totally distinct and unconnected. An ordinary contract of reinsurance is one of indemnity against loss, and no action will lie until the loss has been paid. Upon the insolvency of the insurer the proceeds of the reinsurance become assets to be distributed generally among the creditors, and the original insured has no equitable claim upon them. The liability of the reinsurer is solely and exclusively to the reinsured. Homan v. Employers Reinsurance Corporation, 345 Mo. 650, 136 S.W.2d 289, 127 A.L.R. 163; Strong v. Phoenix Ins. Co., 62 Mo. 289; Thomas v. Land, 225 Mo.App. 216, 30 S.W.2d 1035; Gantt v. American Cent. Ins. Co., 68 Mo. 503; 46 C.J.S. Insurance § 1232a. The reinsurer has no contractual obligation with the original insured and is not liable to him. Thompson, Reinsurance, 3d Ed., pp. 206, 266. In the absence of statutory restrictions, however, reinsurance contracts may be drafted in such a form as to create a liability on the part of the reinsurer not only to the reinsured primitive insurer but also in favor of the original insured. Homan, supra; Gillespie v. Federal Compress & Warehouse Co., 37 Tenn.App. 476, 265 S. W.2d 21; 46 C.J.S. Insurance § 1224a; Thompson, Reinsurance, 3d Ed., p. 267. "In fact, in any case where the contract of reinsurance is more than a mere contract of indemnity, and is made for the benefit of the policyholders of the reinsured, and by it the reinsurer assumes the liability of the latter upon its policies, the liability of the reinsurer may be directly enforced by the insured, or by his privies." 8 Crouch, Cyclopedia of Insurance Law, § 2276, p. 7434. "Accordingly, where, in reinsuring risks for which policies are outstanding, reinsurer contracts with reinsured to assume the policies and to pay the holders thereof all such sums as reinsured may become liable to pay, the persons to whom these original policies are payable acquire a direct right of action against reinsurer, and may sue in their own names and recover on the contract of reinsurance." 46 C.J.S. Insurance § 1232, p. 218. And see 29 Am.Jur., Insurance, § 1370, fn. 20; 35 A.L.R. 1351 et seq.; 103 A.L.R. 1488; 10 L.R.A. 424; 8 L.R.A.,N.S., 862; 45 Am.St.Rep. 447; Ann.Cas.1914A, 1145; Ruohs v. Traders' Fire Ins. Co., 111 Tenn. 405, 78 S.W. 85; Whitney v. American Ins. Co., 127 Cal. 464, 59 P. 897; Barnes v. Hekla Fire Ins. Co., 56 Minn. 38, 57 N.W. 314; Fischer v. Hope Mutual Life Ins. Co., 69 N.Y. 161; Glen v. Hope Mutual Life Ins. Co., 56 N.Y. 379; Shoaf v. Palatine Ins. Co., 127 N.C. 308, 37 S.E. 451; Johannes v. Phoenix Ins. Co., 66 Wis. 50, 27 N.W. 414; Hunt v. New Hampshire Fire Underwriters' Association, 68 N.H. 305, 38 A. 145, 38 L.R.A. 514; Southern States Fire Ins. Co. v. Hand-Jordan Co., 112 Miss. 565, 73 So. 578; Delp v. Missouri State Life Ins. Co., 116 W.Va. 508, 182 S.E. 580; Runbeck v. Farmers' & Bankers' Life Ins. Co., 96 Kan. 186, 150 P. 586; Dickson v. Great American Casualty Co., 269 Ill. App. 532; People ex rel. Kane v. National Surety Co., 68 Colo. 231, 188 P. 653; Cos-

mopolitan Life Ins. Co. v. Koegel, 104 Va. 619, 52 S.E. 166; United States Fire Ins. Co. v. Smith, 231 Ala. 169, 164 So. 70, 103 A.L.R. 1468; Thompson, Reinsurance, 3d Ed., pp. 265–266.

■ There is no need or room for *construction* of the language of the instant Treaty of Reinsurance to determine whether reinsurer contracted to assume the policies and the liability of the reinsured to pay the sums due thereunder. In plain, unambiguous terms reinsurer specifically assumed those obligations. The treaty is no ordinary, conventional, typical contract of reinsurance. It is not merely an agreement between two insurance companies whereby one agrees to indemnify the other against losses or amounts actually paid on judgments or claims. It is much broader than a strict technical reinsurance treaty. It is a contract to indemnify against *liability*, in which reinsurer specifically and in clear terms assumed the total liability of reinsured on its outstanding policies and agreed to service, adjust and settle obligations directly with the insureds on their losses upon the basis of the liabilities of reinsured under its contracts. Reinsured agreed to turn over all its books, papers, records, etc., to reinsurer, which was authorized to and agreed to do all things it deemed expedient in the servicing and handling of the insureds' policies, including the commencement, defense and compromise of, or withdrawal from, lawsuits. The first paragraph of Article V of the Treaty of Reinsurance by which the reinsurer agreed that the reinsurance be payable by it "on the basis of the liabilities of the ceding company under contract or contracts reinsured without diminution because of any insolvency of the ceding company" is indicative of an assumption of liability by the reinsurer to the original insureds. Gillespie v. Federal Compress & Warehouse Co., supra. That the parties contemplated the possibility that the original insureds would undertake to enforce their rights directly against reinsurer in the event of the insolvency of reinsured and that the Treaty of Reinsurance was for the benefit of the policyholders is evidenced from a consideration of the proviso in the fifth paragraph of Article V, which reads as follows:

> "Provided, however, that in the event of an action by the insured directly against the Reinsurer * * * for the use and benefit of the insured, the Reinsurer shall be entitled to assert any of the defenses available to it under Article III hereof * * *."

Reinsurer's liability was "based upon the same terms and conditions as those of the policies of the ceding company." There is no difficulty in concluding that the Treaty was made for the benefit of the policyholders of reinsured. Upon the execution of the treaty reinsurer actually took over and serviced I.C.T.'s outstanding policies, including that of the insureds. Reinsurer paid claims against the insureds arising under the terms of the I.C.T. policy. Reinsurer submitted to the insureds its audits for premiums. Upon the basis of these audits the insureds paid premiums to the reinsurer, premiums which were accepted and retained by reinsurer. When the fifteen lawsuits were filed against the insureds the reinsurer took charge, referred them to reinsurer's counsel, who filed answers, took depositions, negotiated for their settlement, and managed their defense. Reinsurer settled and with its own drafts paid other claims under the policy in question. For all practical purposes Missouri Union became and was substituted for I.C.T. insofar as the insureds were concerned. By receiving and accepting the premiums paid by the insureds upon audits submitted by reinsurer the latter permitted the insureds to perform the terms of the original insurance contract and reinsurer received the benefit of that performance. Reinsurer in these circumstances is in no position to contend that the insureds acquired no right to enforce, as against reinsurer, the obligation which the latter assumed. Milbourne v. Royal

622

Benefit Society, 14 App.Div. 406, 43 N.Y.S. 1026. By taking over the risk assumed by I.C.T. reinsurer put itself in the position of a contractor with the insureds. The law supplies the privity necessary for the insureds to maintain a direct action upon the contract of reinsurance. The bringing of suit is sufficient evidence of assent by the insureds to the Treaty. Whitney . v. American Ins. Co., supra; Sawyer v. Sunset Mut. Life Ins. Co., 8 Cal.2d 492, 66 P.2d 641, 644. The Treaty of Reinsurance is an agreement upon which the insureds had the right to maintain a direct action against the reinsurer for the sums paid by the insureds to satisfy judgments obtained against them.

■ The second question is whether the cancellation of the Treaty of Reinsurance by the parties signatory operated to cancel this right. Appellant argues that any contract may be lawfully modified, rescinded, abrogated or terminated by the parties thereto; that a creditor's right is purely derivative and if the debtor no longer has a right against the promissor, the creditor-beneficiary has none. This argument is untenable. The insureds acquired a vested right to maintain the action by reason of the assumption by reinsurer of reinsured's liability upon the policy of the insureds and the agreement of reinsurer to settle, adjust, etc., the policy obligations directly with the insureds, an agreement implemented and executed by the payment of premiums by the insureds, their acceptance by reinsurer, and by the fact the insureds accepted and adopted reinsurer as the insurer. The treaty was executed, not executory. The purported cancellation of the treaty doubtless effectively cancelled the mutual and reciprocal duties of the parties signatory as between themselves, but it could not and did not effect an extinguishment of the obligations of reinsurer to the insureds (obligations which had accrued prior to the cancellation), in the absence of a consent on the part of the insureds to such extinguishment. A similar problem

was similarly solved in Sawyer v. Sunset Mut. Life Ins. Co., supra. There a cancellation by the parties to a reinsurance agreement in which the reinsurer had agreed to pay all outstanding policies of the reinsured, which cancellation occurred after the death of an insured policyholder, was held not to preclude recovery by the beneficiaries in a direct suit against the reinsurer. The court concluded that "the cancellation served only to do away with the existing agreement as of the date mentioned; but such termination did not relieve appellant of obligations incurred to third parties, such as respondents herein, during the time the contract was in force. The contract in question being one between the two insurance companies for the benefit of third parties, viz., policyholders, the makers thereof cannot cancel the same so as to extinguish the accrued rights of third parties without the assent of the latter. * * (citing cases) When the insured Mack Lewis Sawyer died, September 29, 1930, respondents, as his beneficiaries, became thereby vested with a right to recover jointly from the insurance companies, and the lower court was correct in holding that the subsequent cancellation of the contract between the insurance companies did not obliterate or destroy the vested right and claim theretofore created in respondents." In Ruohs v. Traders' Fire Ins. Co., supra, the reinsurer, acting under a contract between reinsured and reinsurer, received from the reinsured its assets, collected the premiums on the policies, and adjusted the losses under the assumed policies. The contract of assumption by the reinsurer of the risks of the reinsured provided for certain payments by the latter to the former, and that the agreement be null and void upon default in the making of subsequent instalments. The appellate court held that the policyholders could not be prejudiced by such a conditional defeasance, of which they had no knowledge. This point is ruled against appellant.

The last question is whether reinsurer is liable for the full amount, or whether its liability is halved by force of the Retrocession and Quota Share Agreement of Reinsurance. Appellant takes the position that under no theory could the insureds recover from reinsurer more than 50% of the amounts for which they were insured. This position cannot be sustained. Although the Treaty of Reinsurance and the Retrocession and Quota Share Agreement of Reinsurance were executed simultaneously they were not interdependent insofar as the rights of the policyholders of I.C.T. are concerned. Reading the two instruments together the conclusion is inescapable that (1) the treaty gives the policyholder the right to sue Missouri Union directly for the full amount due under a policy and that (2) the retrocession agreement neither gives rights to nor subtracts rights from the policyholder. The retrocession agreement has no effect upon the rights of the policyholders. It does not mention them, or purport to affect them directly, or undertake to limit or enlarge or otherwise affect their rights of recovery under the policy. Nor does it provide for any retraction or withdrawal by Missouri Union of its assumption in the treaty of full 100% liability upon the policies issued by I.C.T. It is a conventional reinsurance agreement and nothing more. It is purely and simply a contract of indemnity between two insurance companies, by which Missouri Union is entitled to recoup from I.C.T. 50% of the losses it suffers in its experience under the Treaty of Reinsurance.

No error appearing, the judgment is affirmed.

COIL and HOLMAN, CC., concur.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.