No. 22-0378 – *Brian Frye v. Erie Insurance Company*

**FILED**

**June 12, 2024**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

Justice Hutchison, concurring:

When you read the majority opinion, a key question should be obvious: Why is the Board of Risk and Insurance Management ("BRIM") not a party to this case? I concur to emphasize that nothing in this case has made sense, from the day it was filed, because BRIM was both omnipresent in the facts and yet missing as a party. On remand, the circuit court needs to (1) review the constitutional problems within the mine subsidence insurance scheme created by West Virginia Code §§ 33-30-1, *et seq.*, and BRIM's supporting regulations (115 C.S.R. § 1), and, (2) thereafter, likely reconsider its summary judgment ruling in favor of the defendant, Erie Insurance.

The primary problem with the statutory and regulatory scheme at issue in this case is that BRIM and homeowners' insurers like Erie have, in effect, immunized each other from having to ever pay mine subsidence claims. In its annual reports, BRIM says that it operates a legislatively created "coal mine subsidence reinsurance program, which allows homeowners and businesses to obtain insurance coverage up to $200,000 for collapses and damage caused by underground coal mines."[1] The gist of the program is that private insurance companies incorporate a BRIM-drafted mine subsidence insurance provision into every fire insurance policy they sell to private homeowners and businesses;

_____

[1] *See, e.g.*, State of West Virginia Board of Risk and Insurance Management, *2023 Annual Report*, 2 (Aug. 28, 2023).

1

the insurers collect an annual premium; and then those "insurers pay BRIM a reinsurance premium, which is equal to the gross premiums collected for mine subsidence coverage," except the insurers keep for themselves "a 30% ceding commission."[2] BRIM claims (with emphasis added) that it "provides mine subsidence *reinsurance* to approximately 15,000 home and business owners" in West Virginia.[3]

The problem is, as both the majority opinion and Justice Wooton's separate opinion make clear, BRIM acts as anything but a plain, generic reinsurer. A classic reinsurer would have allowed Erie to investigate and pay worthy claims and then reimbursed Erie for some or all of the claim – that is, it would have reinsured some share of the risk of subsidence claims covered by Erie. BRIM calls itself a "reinsurance program," but state law and BRIM's regulations penalize insurers like Erie who investigate and pay claims. BRIM requires every subsidence claim to be "reported to [BRIM] for assignment to qualified independent adjusting firms[.]"[4] Moreover, "[a]ll payment authorizations will come from the Board. No reinsurance will be available for claims paid by the [insurer] without prior approval from the Board."[5]

---

[2] *Id.*

[3] *Id.* at 3. That BRIM represents it provides reinsurance to "home and business owners," rather than to insurance companies, suggests that BRIM is not really a reinsurer at all. Instead, it indicates BRIM understands it has privity with each and every homeowner who purchases mine subsidence coverage. *See infra*, footnote 1818.

[4] 115 C.S.R. § 1.4.1.

[5] 115 C.S.R., App'x D, ¶ 5.

2

The result is a Dolittlean push-me, pull-you[6] legal creation that results in both insurers and BRIM evading responsibility. Insurers write and issue policies that they insist cannot be honored without BRIM's permission; BRIM does all the work to deny claims against the policy while politely saying it has no responsibility for the policy issued by the insurer. And, as I discuss below, the premiums collected by BRIM for those policies pile up in the state treasury within the mine subsidence insurance fund.

And this brings me to a second unifying thread that weaves through this case: the idea of illusory coverage. Sitting between BRIM and insurers are the homeowners and business owners who paid their premiums thinking they have mine subsidence insurance. True, the annual premiums for the maximum amount of $200,000 in coverage are modest, at $43.00 on homes and $86.00 for "non-dwelling structures" (like businesses).[7] But, in the end, it appears that BRIM and insurers work together to deny just about every claim that gets filed. People are paying a premium for non-existent coverage.

Let me explain my sense this coverage is illusory. Recall that BRIM only receives 70% of the premiums collected by insurers; the insurers keep the remainder. In its latest annual report, BRIM says it collected $4,824,000 in such premiums in 2022.[8]

---

[6] "Pushmi-pullyus . . . had no tail, but a head at each end, and sharp horns on each head. They were . . . terribly hard to catch." Hugh Lofting, *The Story of Doctor Dolittle*, 81 (1920).

[7] 115 C.S.R., App'x C.

[8] *2023 Annual Report* at 11.

3

Missing from BRIM's report, however, is any clear discussion of how many mine subsidence claims it paid or how much it paid per claim, or in total, in 2022. Instead, one must divine results by looking at two charts assessing BRIM's financial performance over the prior ten years. These charts show BRIM collected $33,975,000 for mine subsidence insurance in the ten-year period between Fiscal Years 2013 and 2022. Simultaneously, in the same ten-year period, BRIM appears to have paid out only $5,018,000 toward subsidence claims.[9]

Read that again: BRIM collected $4.8 million in one year but paid out only $5 million toward mine subsidence claims over the previous ten years. Without doing an exhaustive analysis of BRIM's public-facing records, it seems obvious BRIM pays out only a fraction of premiums on claims. For instance, another report says that after taking in $2,398,000 in premiums in Fiscal Year 2016,[10] BRIM's reports show (with emphasis added) that it paid as little as $184,000 on "[c]laims and *claims adjustment expenses attributable to insured events in the current fiscal year.*"[11] The emphasis is added because BRIM's reports do not make clear how much money BRIM is spending in "claims

---

[9] *Id.* at 12.

[10] Premiums were lower during the 2016 fiscal year because, at that time, mine subsidence insurance payouts were capped at $75,000.

[11] State of West Virginia Board of Risk and Insurance Management, *2018 Annual Report*, "Reconciliation of Unpaid Claims and Claims Adjustment Expense Liability by Type of Contract," at 171 (Aug. 28, 2018) (emphasis added).

4

adjustment expenses," such as for hiring "experts" to examine properties. Instead, expert expenses are combined together with monies paid to property owners.

Regarding expert expenses, recall that in the instant case, the record shows that BRIM paid no less than four separate engineering groups to examine Mr. Frye's property claim.[12] These engineering groups note that the Valley Camp No. 1 mine, which was last mined in 1985, lies 373 feet directly below Mr. Frye's property. These experts all opined in harmony that a hollowed-out room collapsing in the Valley Camp mine below could *never* damage the Frye property. The opinions from these BRIM-paid experts, in turn, were used by Erie to decide it would not provide coverage under Mr. Frye's homeowner's insurance policy.

Another measure of just how little BRIM pays out toward subsidence claims is found in its reported "loss ratio." In the context of insurance, "loss ratio" is a measure of losses by the insurer from paying insurance claims, along with the related administrative and adjustment expenses (like expert fees), all divided by the total earned premiums. A high loss ratio means less money in an insurer's pockets; a ratio exceeding 100% means the insurer is losing money. But these ratios can ebb and flow. For instance, in the last

---

[12] Experts known to have been hired by BRIM to review Mr. Frye's claim are: (1) Irvine Associates; (2) Al Bragg of Romauldi, Davidson & Associates (inspected once but wrote two different reports); (3) Robert Bloomberg of Bloomberg Consulting Engineers (inspected and wrote one report); and (4) John Hempel (registered professional geologist), Jennifer Boyle (environmental specialist), and Keven Boyle (wildlife biologist) of EEI Geophysical Damage Investigations (inspected and wrote one report).

quarter of 2021, the overall loss ratio for all U.S. homeowners insurance companies was 89.56 percent, in part because of significant losses from a major hurricane;[13] that loss ratio quickly reversed and improved to 53.9 percent in the first quarter of 2022.[14]

At the same time, in BRIM's 2021 Annual Report, an actuary found that the mine subsidence reinsurance program "continues to perform at a favorable loss ratio" because it was averaging a mere "23% over the past 10 years."[15] Stated differently, while the homeowners insurance industry was swinging between loss ratios of 50 to 90 percent, BRIM's mine subsidence insurance program was gliding by on a 23 percent ratio. That means BRIM – which, the last time I checked, was a public agency designed to serve the citizens of West Virginia – was pocketing 77 percent of the premiums for mine subsidence coverage that it received.

---

[13] S&P Global, *US Homeowners Industry Loss Ratio Again Nears 90%* (Jan. 6, 2022) (found at https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/us-homeowners-industry-loss-ratio-again-nears-90-68160774 (last accessed May 9, 2024).

[14] S&P Global, *US Homeowners Industry Posts Big Premium Gains, Loss Ratio Declines in Q1* (June 22, 2022) (https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/us-homeowners-industry-posts-big-premium-gains-loss-ratio-declines-in-q1-70850250 (last accessed May 9, 2024). The best performing insurer (Farmers Insurance) posted a 40% loss ratio, while the worst performer (Liberty Mutual) had a 60.9% ratio.

[15] Board of Risk and Insurance Management, *2021 Annual Report*, "Risk Funding Study" by AON at 237 (August 28, 2021).

And this showed in BRIM's balance sheet. By June 30, 2022, BRIM had a net position of $80,155,000 for "mine subsidence coverage."[16] Then the Legislature, during its 2023 session and at BRIM's urging, passed a law moving $50 million out of the mine subsidence fund for BRIM to spend on claims against various state agencies.[17] This effectively converted years of premiums paid by homeowners and businesses for mine subsidence insurance into a tax to fund BRIM's day-to-day expenses. And, in the end, mine subsidence insurance paid for by some 15,000 West Virginia households and businesses gave every outward appearance of being illusory.

In summary, this case is confounding because BRIM should have been a party, or at least have been compelled to have some process whereby property owners could duly challenge its mine subsidence decisions. If we were to sanction the circuit court's summary judgment ruling, homeowners like Mr. Frye would be deprived of any means of challenging BRIM's methodology, its push-me, pull-you shell game with private insurance companies. Thus, the circuit court's instinct that the entire program was constitutionally problematic seems correct. Unfortunately, as the majority opinion makes clear, until the circuit court ruled that Mr. Frye could not proceed with his contract claims against Erie, his constitutional claims were neither apparent nor necessary. Throughout this case, the

---

[16] *2023 Annual Report* at 31.

[17] *See* H.B. 3542 (passed March 10, 2023) (decreasing monies in the "Mine Subsidence Insurance Fund . . . by expiring the amount of $50,000,000"); *2023 Annual Report* at 28 (describing how the money would be used to cover claims against other state agencies, like schools).

circuit court represented to Mr. Frye that he had a viable contract claim against Erie. And then, at the summary judgment stage, the circuit court changed course and said that he did not; it was only at that point that Mr. Frye was obligated to challenge the constitutionality of the statutory and regulatory scheme that rendered the contract claim unviable.

As the current system works, Erie is being "hung out to dry" for something it did not do, whilst the plaintiff is being deprived of any remedy. With the constitutionality of the program properly challenged, and the Attorney General advised of Mr. Frye's claims and invited to participate, the parties and the circuit court will be better prepared to understand the true nature of the relationship between insurers and BRIM. And Mr. Frye and Erie will be able to better address chapter 30 of article 33, and BRIM's legislative rules.

Moreover, the majority opinion is rightly silent regarding the circuit court's summary judgment order. With the constitutional questions again before the circuit court in plaintiff Frye's Rule 59 motion, the parties are situated to readdress Mr. Frye's contract claims in the context of the constitutional questions presented. I see nothing in state law or BRIM's regulations that prohibit a homeowner from asserting a breach-of-contract claim against an insurer with whom the homeowner maintained a mine subsidence insurance contract. I likewise see nothing to preclude the homeowner from pursuing an action against BRIM for interfering with that privately obtained insurance contract.[18] Essentially, it

_____

[18] A handful of courts have recognized that, in limited circumstances, an insured may have a cause of action against their insurer's reinsurer. One of those limited

8

circumstances is when the reinsurance contract is more than a contract of indemnity but is, effectively, the contract for insurance directly to the insured where the reinsurer takes the reins of administering and adjusting claims. For instance, in *O'Hare v. Pursell*, 329 S.W.2d 614 (Mo. 1959), the court allowed insureds to pursue claims directly against a reinsurer because the reinsurer's policy was effectively for the benefit of the insured, not the primary insurer:

> An ordinary contract of reinsurance, in the absence of provisions to the contrary, operates solely as between the reinsurer and the reinsured. It creates no privity between the original insured and the reinsurer. The contract of insurance and the contract of reinsurance are totally distinct and unconnected. An ordinary contract of reinsurance is one of indemnity against loss, and no action will lie until the loss has been paid. . . . The liability of the reinsurer is solely and exclusively to the reinsured. The reinsurer has no contractual obligation with the original insured and is not liable to him. . . . [H]owever, reinsurance contracts may be drafted in such a form as to create a liability on the part of the reinsurer not only to the reinsured primitive insurer but also in favor of the original insured. . . . [W]here the contract of reinsurance is more than a mere contract of indemnity, and is made for the benefit of the policyholders of the reinsured, and by it the reinsurer assumes the liability of the latter upon its policies, the liability of the reinsurer may be directly enforced by the insured[.]

329 S.W.2d at 620 (cleaned up). The discussion in *O'Hare* seems indistinguishable from the instant case. West Virginia law requires insurers to offer mine subsidence insurance ostensibly backed by the reinsurance fund administered by BRIM. But private insurers must charge premiums set by BRIM, irrespective of the private insurers' actual processing, indemnity, or bad faith expenses; insurers must use policy language drafted by BRIM; BRIM adjusts every claim; and BRIM represents in its annual reports that it provides reinsurance to "home and business owners," rather than to insurance companies. These circumstances suggest that BRIM is not really a reinsurer at all. Instead, it indicates BRIM understands it has privity with each and every home and business owner who purchases mine subsidence coverage. *See also*, *Felman Prod., Inc. v. Indus. Risk Insurers*, No. CIV.A. 3:09-0481, 2009 WL 3380345, at *2 (S.D.W. Va. Oct. 19, 2009) ("A reinsurer may also become directly liable to the insured via conduct; generally by directly handling an insured's claim. *See Klocker Stadler Hurter Ltd. v. The Insur. Co. of Penn.*, 785 F.Supp. 1130, 1134 (S.D.N.Y.1990) (finding a reinsurer that directly handled an insured's claim is directly liable to that insured); *Allstate Insur. Co. v. Administratia Asigurariloar De Stat*,

9

behooves homeowners and insurers alike to assess the nature of private mine subsidence insurance contracts in the light of BRIM's public responsibility to maintain the mine subsidence fund, and for BRIM to fairly meet its reinsurance obligations, within constitutional considerations of due process.

Accordingly, I respectfully concur with the majority's opinion.

---

948 F.Supp. 285 (S.D.N.Y.1996) (same); *Venetsanos v. Zucker, Facher & Zucker*, 271 N.J.Super. 459, 638 A.2d 1333 (N.J.Super.1994) (same)."); 8 Blashfield Automobile Law and Practice § 342:12 (2023) ("[A] reinsurance contract may be drawn in such form and with such provisions as to create a liability on the part of the reinsurer directly to the original insured."); David J. Marchitelli, *Who May Enforce Liability of Reinsurer*, 87 A.L.R.6th 319 (2013) ("[C]ourts have found that . . . third parties were entitled to proceed directly against a reinsurer . . . where the reinsuring document, either by intent or poor draftsmanship, created rights in third parties and became more than an ordinary reinsurance agreement or where an overreaching reinsurer exposed itself to liability by behaving more like a primary insurer than a reinsurer.").

The statutory-regulatory-contractual relationship between BRIM and Erie might also be characterized as a "fronting" arrangement where a licensed insurer writes a policy that is then ceded to an unlicensed reinsurer who controls claims decisions. Esteban Carranza-Kopper, *Fronting Arrangements: Industry Practices and Regulatory Concern*s, 17 Conn. Ins. L.J. 227 (2010).