FIRST NATIONAL BANK OF KANSAS CITY, a corporation, Executor of the Estate of Franklin E. Whiteley, deceased, Appellant,

v.

T. James HIGGINS, Defendant,

General Reinsurance Corporation, Appellant, C. Lawrence Leggett, Receiver of International Indemnity Exchange, Respondent.

No. 48379.

Supreme Court of Missouri,

En Banc.

March 26, 1962.

Rehearing Denied May 14, 1962.

Lucian Lane, Woodruff & Lane, Kansas City, for appellant.

Paul C. Sprinkle, Sprinkle, Carter, Sprinkle & Larson, Kansas City, for garnishee-appellant.

Charles H. Howard, Jefferson City, Hendren & Andrae, Jefferson City, of counsel, for interpleader-respondent.

STOCKARD, Commissioner.

◼ Garnishor and garnishee have appealed from a judgment wherein the trial court awarded the amount sought by the garnishor to the Superintendent of the Division of Insurance (hereafter called "Superintendent") as receiver of the assets of the insolvent International Indemnity Exchange (hereafter called "International"). This court has jurisdiction because the Superintendent in his capacity as a state officer is a party. Leggett v. General Indemnity Exchange, 363 Mo. 273, 250 S.W.2d 710.

International entered into an agreement with General Reinsurance Corporation (hereafter called "General") whereby it reinsured with General certain obligations arising under its automobile liability policies. The effect of this agreement is the principal issue on this appeal and its terms will be discussed in detail subsequently. International issued to James T. Higgins its "Multiple Peril Policy" of automobile liability insurance, and while it and the reinsurance agreement were in effect Higgins was involved in an automobile accident. Suit for personal injuries was filed against him by Edna Whiteley and a separate suit for consequential damages was filed against him by Franklin E. Whiteley, husband of Edna. Mr. Whiteley subsequently died and the First National Bank of Kansas City, as executor of his estate, has been substituted as party plaintiff. Edna Whiteley obtained judgment against Higgins and received $7,500 in satisfaction thereof. Before the husband's suit for consequential damages was tried the Superintendent brought proceedings against International pursuant to Section 375.560, RSMo 1959, V.A.M.S., alleging that it was insolvent, and obtained a judgment vesting in him as receiver all of its assets. Counsel for Higgins, which had been furnished by International in the suit for consequential damages, withdrew from

that case. Mr. Whiteley then served notice on the Superintendent and on General to defend the suit, and when both either refused or failed to do so he obtained a judgment against Higgins in the amount of $5,000. This judgment was not satisfied, general execution was issued, and summons of garnishment was served on General. Interrogatories were exhibited to and answered by General in which it denied that it was obligated to Higgins. Plaintiff-garnishor filed a denial and set forth his contentions and claim, and General filed its reply and the issues were thus formed. General then filed and the trial court sustained a motion to require that the Superintendent be made a party to the garnishment proceeding. After first unsuccessfully seeking a writ of prohibition in this court the Superintendent filed what he termed a counterclaim against plaintiff and a cross-claim against General in which he asserted that plaintiff-garnishor had no right to recover against General and that all money payable by General under the reinsurance agreement was payable to him as receiver "on behalf of all the creditors of International." The trial court ruled that the Superintendent was "entitled to judgment against [General] in the sum of $5,000 with interest." Plaintiff-garnishor and General have appealed.

For a valuable consideration General agreed in Article I of the reinsurance agreement to "accept reinsurance" from International as set forth in Exhibit A attached to and made part of the agreement and entitled "Excess Reinsurance of Automobile and other Bodily Injury Liability-Single Limit Liability." Section 1 of the exhibit, entitled "Cover," provided that "as respects accidents" occurring under policies of insurance "covered hereunder" International was to "pay in respect of each accident the amount of loss indicated" therein as "Company's Retention." General agreed to accept "on an excess basis, all loss above said retention; provided the loss to the Reinsurer on account of each accident shall not exceed the amount set forth * * * as

'Maximum Amount to be Reinsured with Reinsurer.'" International's retention of "Automobile and other Bodily Injury Liability" was stated to be $5,000 per person and $10,000 per accident, and the "Maximum Amount to be Reinsured with Reinsurer" was $20,000 per person and $40,000 per accident. As the "provisional premium" for the reinsurance, International was to pay General "the actual excess premium charged" the policyholder for the limits reinsured less a commission to be retained by International. A "rating formula" was provided for determining premiums payable to General, and therein the term "losses" in respect to any rating period was defined to mean "paid loss and loss expense plus pending loss and loss expense resulting from accidents occurring during said period." It was further provided in the exhibit that "as respects a loss for which the Company [International] is held liable for an amount in excess of the policy limit, the Reinsurer [General] hereby agrees to assume seventy-five percent (75%) of that part of such loss which is in excess of the policy limit, provided that as respects such loss, the Company shall retain the amount applicable * * * as 'Company's Retention' and the liability of the Reinsurer under this Exhibit shall not exceed the amount applicable * * * as 'Maximum Amount to be Reinsured with Reinsurer.'"

Article II of the reinsurance agreement pertained to "General Exclusions and Special Acceptances." Article III, entitled "Liability of Reinsurer," was as follows: "The liability of the Reinsurer [General] shall follow that of the Company [International] in every case and shall be subject in all respects to all the general and special stipulations, clauses, waivers and modifications of the Company's policy, binder, or other undertaking and any endorsements thereon; * * *. Payments under this Agreement shall be made directly to the Company or to its liquidator, receiver or statutory successor on the basis of the liability of the Company under the contracts reinsured, without diminution because of

the insolvency of the Company. It is agreed, however, that the liquidator or receiver or statutory successor of the insolvent Company shall give written notice to the Reinsurer of the pendency of a claim against the insolvent Company on the contracts or contract reinsured within a reasonable time after such claim is filed in the insolvency proceeding and that during the pendency of such claim the Reinsurer may investigate such claim and interpose, at its own expense, in the proceeding where such claim is to be adjudicated any defense or defenses which it may deem available to the Company or its liquidator or receiver or statutory successor. The expense thus incurred by the Reinsurer shall be chargeable, subject to court appeal, against the insolvent Company as part of the expense of liquidation to the extent of a proportionate share of the benefit which may accrue to the Company solely as a result of defense undertaken by the Reinsurer."

By Article IV International agreed to advise General of "all claims and any subsequent developments pertaining thereto, which may in its opinion develop into losses involving reinsurance hereunder. * * * All payments of claims (including the interest accrued prior to the judgment where such interest is added to the judgment) in which this reinsurance is involved shall be binding upon the Reinsurer, which shall be bound to pay or allow, as the case may be, its proportion of such payments." There then followed a provision for apportioning certain expenses, and it was also provided that upon request International would "afford the Reinsurer an opportunity to be associated with the Company, * * * in the defense or control of any claim or suit or proceeding involving this reinsurance, * * *." It was then provided that the "Reinsurer shall reimburse the Company promptly for loss against which indemnity is herein provided, upon receipt by the Reinsurer of satisfactory evidence of payment of such loss."

Article V, entitled "Salvage," provided that in the event International obtained "reimbursement" or made a "recovery," General was to receive credit, when the reinsurance is on the share basis, with "its share of any salvage on account of claims and settlements involving reinsurance hereunder," and when the reinsurance is on the excess basis, the salvage should "always be used to reimburse the excess carriers in the reverse order of their priority * * * before being used in any way to reimburse [International] for its primary loss." The remaining articles, entitled "Reports and Remittances," "Reserves and Taxes," "Inspection," and "Arbitration" have no bearing on the issues presented. The provisions of the arbitration article, if its provisions are or would be binding on the Superintendent and General after receivership, have been waived by them. It does not appear that the issue was raised in the trial court, and no mention of the article is made by any party to this appeal.

"An ordinary contract of reinsurance, in the absence of provisions to the contrary, operates solely as between the reinsurer and the reinsured. It creates no privity between the original insured and the reinsurer. The contract of insurance and the contract of reinsurance are totally distinct and unconnected." O'Hare v. Pursell, Mo.Sup., 329 S.W.2d 614, 620; 46 C.J.S. Insurance § 1232a. Such reinsurance contract may be one of indemnity against loss or of indemnity against liability, and in the event the contract is the former no action will lie thereon, absent some statutory provision which in effect converts such contract to one of indemnity against liability, until payment has been made. If the reinsurance contract is one of indemnity against liability, whether by its terms or by operation of statute, the liability of the reinsurer thereunder becomes fixed when the reinsured company incurs liability under its policy to the original insured. In this event, upon the insolvency of the reinsured company the proceeds due under the reinsurance contract constitute assets of the insolvent company. The original insured, that is, the policyholder, has no special claim

upon them. Whether the reinsurance contract is for indemnity against loss or against liability, the liability of the reinsuring company is solely to the reinsured company, or to its receiver in the event of its insolvency. However, in the absence of statutory restrictions, and there are none in this case, a reinsurance contract may be drawn in such form and with such provisions so as to create a liability on the part of the reinsurer directly to the original insured. For example, see Homan v. Employers Reinsurance Corporation, 345 Mo. 650, 136 S.W.2d 289, 127 A.L.R. 163; and O'Hare v. Pursell, supra. See also 46 C.J.S. Insurance § 1224a, and the cases cited in 35 A.L.R. at page 1351 and 103 A.L.R. at page 1488. Such liability necessarily must be based on the theory that the original insured is a third party beneficiary of the reinsurance agreement. In Couch, Cyclopedia of Insurance Law, § 2276, p. 7434, it is stated that "in any case where the contract of reinsurance is more than a mere contract of indemnity, and is made for the benefit of the policyholders of the reinsured, and by it the reinsurer assumes the liability of the latter on its policies, the liability of the reinsurer may be directly enforced by the insured, or by his privies." See, also, the cases cited in O'Hare v. Pursell, supra, 329 S.W.2d at page 620.

From the above it is readily apparent that the first question for determination is whether, as General contends, the reinsurance agreement in this case provided for indemnity against loss only as distinguished from indemnity against liability. If so, then since neither International nor the Superintendent, as receiver, has paid any amount on the judgment in favor of plaintiff-garnishor, there has been no loss, and General owes nothing to plaintiff-garnishor nor to the Superintendent under its contract. However, if the reinsurance agreement is one of indemnity against liability, then General owes $5,000 under its agreement, and the question remains whether this liability of General is an asset of the insolvent International to which the Super-

intendent is entitled, or whether this liability is to plaintiff-garnishor as the third-party beneficiary of the reinsurance agreement.

■ In view of the numerous cases in this and other jurisdictions in which the issue has been presented whether the language of a reinsurance agreement results in indemnity against actual loss or against liability, it is not entirely without significance that the agreement in this case has been worded in such a way that proponents of either position can point to isolated phrases in the agreement which, standing alone, support their position. If indemnity against loss only had been intended it would have been easy to so state in clear and unequivocal language. When the agreement as a whole is read it is immediately apparent that the term "loss" is used in the agreement to refer to the fact of actual payment of claims under the policies insured and also to the incurrence of liability under the policies whether or not any payment actually has been made. Reference to the terms of the agreement as previously set out will so demonstrate. It is apparent when it was stated in the reinsurance agreement, "as respects accidents * * * under policies of insurance" reinsured, that International should pay "the amount of loss" indicated as "company's retention," reference was had to the obligation of International under the policies, which by their terms and by reason of §§ 379.195 and 379.200 RSMo1959, V.A.M.S., provided indemnity to the policyholder against liability, not loss. When the agreement further provided in the same sentence that General "accepts, on an excess basis, all loss above said retention," within the limits therein set out, this reference also was to liability under the policies. In Section 1 of the exhibit attached to the reinsurance agreement, the terms "Company's Retention" and "Maximum Amount to be Reinsured with Reinsurer" expressly referred to "Automobile and other Bodily Injury Liability" under the policies. In addition, note the following language in Article III of the

agreement which is entitled "Liability of Reinsurer." "The *Liability* of the Reinsurer [under the reinsurance agreement] shall follow that of the Company [International] in every case * * *. *Payments* under this Agreement *shall be made* directly to the Company or to its liquidator, receiver or statutory successor *on the basis of the liability of the Company under the contracts reinsured,* without diminution because of the insolvency of the Company." (Italics added.) To hold, as General contends, that under the existing circumstances the reinsurance agreement was limited to indemnity against loss would require us to ignore completely the above provision. There is no reasonable explanation for its presence in the agreement consistent with the contention of General, and when it is recognized that throughout the reinsurance agreement the term "loss" is used in a dual meaning, the presence of the above provision is consistent with the construction of the agreement as one of indemnity against liability, and we so hold. See Homan v. Employers Reinsurance Corporation, supra, and the careful and complete analysis there made of a reinsurance agreement with provisions remarkably similar to those in this case and where it was also contended that the agreement was for indemnity against loss only.

We turn now to the question of whether plaintiff-garnishor or the Superintendent is entitled to the proceeds due under the reinsurance agreement. This depends upon whether the agreement established the policyholders of International as third-party beneficiaries, or whether the proceeds of the reinsurance constitute assets of the insolvent International.

International's policy to Higgins provided that it was "to pay on behalf of [Higgins] * * * all sums which [Higgins] shall become legally obligated to pay as damages because of bodily injury, sickness, or disease * * * caused by accidents arising out of the ownership, maintenance, or use of the automobile described in this policy * * *." One of the "conditions" set forth in the policy was that no action should lie against International unless the insured, Higgins, should have fully complied with the terms of the policy, nor until the amount of the insured's obligation to pay be finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant, and International. It was then provided in the policy that "Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover [against International] under this form [policy] to the extent of the insurance afforded by this form * *." We shall turn now to the terms of the reinsurance agreement. By it General agreed to accept "Excess Reinsurance of Automobile and Other Bodily Injury Liability," and it was provided that "as respects accidents * * * under policies of insurance of the kinds covered hereunder * * * the Company will pay * * * the amount of loss [actually the amount of liability] indicated below as 'Company's retention' and * * * [General] hereby accepts, on a excess basis, all loss [actually the amount of liability] above said retention" within the stated maximum limits. The reinsurance agreement then provided that the "*liability* of [General] shall *follow* that of [International] in every case and be *subject in all respects to* all the general and special stipulations, clauses, waivers and modifications of [International's] policy, binder, or other undertaking and any endorsements thereon; * * *." (Italics added.) For and in consideration of this undertaking General received all of "the actual excess premium charged" by International for the limits of liability reinsured less a commission to International. It is true that by entering into this agreement with General it was not possible for International to relieve itself of its primary liability under its policy for the amounts above its "retention," but it was not necessary that it be so relieved before the rein-

surance agreement could constitute the policyholder a third-party beneficiary thereof. A similar provision in a reinsurance agreement was considered by this court in Homan v. Employers Reinsurance Corporation, supra, and at page 298 of 136 S.W.2d it was said: "The words 'subject to' are defined by lexicographers as meaning 'liable,' and the word 'liable' is defined as 'bound or obligated in law or equity; responsible; answerable.' * * * 'Subject to' is also defined as 'controlled by.' * * * The particular clause of the contract provided * * * that 'each reinsurance hereunder shall be subject to all the general and special terms and conditions of such policy and endorsements.' We think this clause should be construed in a reasonable and common sense manner with a view to the necessary intention of the parties at the time the contract was made. It meant, of course, only such terms and conditions as were reasonably applicable to such a contract of reinsurance between the parties and such terms and conditions, therefore, as the parties may be presumed to have had in mind when the contract was made. * * * The original policy issued by [the then insolvent insurance company] to [the policyholder] * * * expressly provided for the payment of any final judgment for a personal injury cause by any of the motor vehicles operated by [the policyholder], within the limits set forth, and further provided that upon failure to pay any such final judgment, such judgment creditor could maintain an action in any court of competent jurisdiction to compel such payment. We think it was reasonably within the contemplation of the parties that such provisions of the policy become a part of the reinsurance contract and the reinsurer became bound thereby for the excess. *It was for the benefit of* [the insurance company] *and for its insured that such judgments,* for which it was liable, *be covered by such contract. The reinsurance of the excess was in effect upon the same terms and conditions.* If the reinsurance contract was not to be subject to the provisions set out

in the primary insurance contract, to wit, that any judgment against [the policyholder] be paid the contract could have been made definite and certain. It was a matter particularly appropriate to the subject matter of the reinsurance contract, and in view of the particular terms of the reinsurance contract, we may presume that the parties had such result in view when the contract of reinsurance was made." (Italics added.) In considering the motion for rehearing in the Homan case, it was stated that the reinsurance agreement was "primarily" for the benefit of the policyholders of the reinsured company.

We are in complete agreement with the above statements and with their application to the facts of this case. The primary purpose of reinsurance which provides indemnity against liability as distinguished from indemnity against actual loss is to guarantee the integrity of the policies of the reinsured company. This is particularly true in this case, because by providing that the liability of General shall follow and be subject to that of International under its policies, General assumed the liability on International's policies for the excess amount reinsured. Therefore, the policyholder, or those who may claim under him, are third-party beneficiaries of such reinsurance agreement. When the judgment was rendered against Higgins and remained unpaid a cause of action against International accrued to Higgins under the policy, and to plaintiff-garnishor under the policy and the statutes. As third-party beneficiary of the reinsurance agreement, a cause of action for the amounts reinsured also accrued to plaintiff-garnishor against General. See Homan v. Reinsurance Corporation, supra at page 300 of 136 S.W.2d where it is said: "The measure of [policyholder's] liability to plaintiff was also the measure of [insurance company's] liability to plaintiff. The measure of the liability of [reinsurance company] to plaintiff * * * must be measured by the terms of· the agreement entered into between the [reinsurance company] and [insurance com-

pany] providing for the payment of the judgments against [policyholder] in excess of the amounts fixed and within the limits prescribed. The measure of liability of [reinsurance company] to plaintiff, * * * remains and is the same whether [insurance company] remains solvent or insolvent." While some authority may be found to the contrary, see Stickel v. Excess Ins. Co. of America, 136 OhioSt. 49, 23 N.E.2d 839 and Melco System v. Receivers of Trans-America Ins. Co., 268 Ala. 152, 105 So.2d 43, there is no contention that the reinsurance agreement was not a Missouri contract governed by the law of this state, and we think the correct and applicable rule is set forth in the Homan case.

We find only one material distinction between the facts of this case and those in the Homan case. In Article III of the reinsurance agreement is the following provision which apparently was not in the reinsurance agreement in the Homan case, or at least if present no specific mention was made of it. "Payments under this Agreement shall be made directly to [International] or to its liquidator, receiver or statutory successor on the basis of the liability of [International] under the contracts reinsured, without diminution because of the insolvency of the Company." It is upon this provision that the Superintendent principally relies to claim the funds "on behalf of all the creditors of International." Since the reinsurance in the Homan case was, as in this case, excess insurance, in the absence of the above provision the only feasible procedure for the reinsurance company to make payment, at least prior to insolvency proceedings, would be to make it to the company issuing the policy so that one check for the total amount could be issued to the claimant.

In order to determine the effect of this provision we must examine its purpose and read it in context. Ordinarily a claim under a reinsured policy exceeding the amount of International's "retention" would be paid from two sources. Inter-national would pay the amount of "retention" and General would pay the "excess." But, it was not contemplated that the recipient should receive two checks. Instead, General would pay International who would issue a single check to the claimant. This arrangement did not mean that General was not directly liable to the third-party beneficiary for its excess share. Also, if International paid the full amount of the claim, it then had a claim against General for reimbursement of the amount paid on General's behalf. This is contemplated in the agreement by the provision in Article IV that General should "reimburse" International promptly for loss against which indemnity is provided "upon receipt by the Reinsurer of satisfactory evidence of payment of such loss." If after International made payment of General's share, International became insolvent, then the provision becomes applicable that General should pay the full amount without reduction to the receiver. It is clear that prior to the insolvency of International the provision calling for General to make payment of its share of excess coverage was for expedience in making payment of General's liability to the third-party beneficiary; it was not intended to relieve General of that liability. The next question is whether General be relieved of that liability to the third-party beneficiary after insolvency of International because of this provision concerning the method of payment. As previously noted the primary purpose of the reinsurance constituting indemnity against liability is to guarantee the integrity of the policies, and that is true whether or not the insurance company is insolvent. In fact, the effect on the policyholder, and those who claim under his policy, of the insolvency of the company issuing the policy is the principal contingency to be guarded against by the reinsurance. However, it is significant that should the contention of the Superintendent be sustained, the result would be quite the opposite. When we read the above provision in con¹ext and in connection with the overall purpose of the

reinsurance agreement, it is clear that the provision for payment of the money to the liquidator, receiver or statutory successor was for the purpose of providing a procedure of payment to the claimants in order to guarantee the integrity of the policies; not to assure payments to general creditors whose interest General had no concern or reason to indemnify under the provisions of its reinsurance agreement. This general question was considered in that part of the opinion in the Homan case disposing of contentions in the motion for rehearing. The reinsurance company there argued that it would be liable to the insurance company's assigns and also to the judgment creditor of the policyholder. At page 302 of 136 S.W.2d it was held: "The resinsurance agreement, in so far as it provides for the payment of any judgment against [the policyholder], is of course, an agreement for the benefit, not only of plaintiff, but also of [the policyholder] and [the insurance company], although primarily for the benefit of plaintiff [judgment-creditor of the policyholder], the ultimate and primary beneficiary. But defendant's [reinsurance company's] liability under the reinsurance agreement will be discharged, * * upon the application of said funds, representing the liability of defendant under the terms of said agreement, to the payment of plaintiff's judgments. If [the insurance company] collected under its cause of action for the failure of [reinsurance company] to pay said judgments and discharge its liability thereon the recovery would have been for the benefit of plaintiff (in this connection see Equitable Surety Co. v. United States, to Use of W. McMillan & Son, 234 U.S. 448, 456, 34 S.Ct. 803, 805, 58 L.Ed. 1394)." The Superintendent, as receiver, acquired no greater rights under the reinsurance agreement than International had.

Plaintiff-garnishor in this case was the third-party beneficiary under the reinsurance agreement, and if International or its liquidator, or receiver, or statutory successor collected from General the amount due

from it under the judgment obtained against Higgins it would have been for the benefit of plaintiff-garnishor. In this situation where all the parties concerned are parties in the garnishment proceeding and on this appeal, there is no occasion for the funds due plaintiff-garnishor under the reinsurance agreement to be transmitted to him from General through the Superintendent. Therefore, upon demand by plaintiff-garnishor, which demand was made by filing the garnishment proceeding, payment should be made by General directly to plaintiff-garnishor, and such payment will discharge all of its liability under its reinsurance agreement to the Superintendent as to this particular claim.

The judgment is reversed and remanded for the entry of a judgment according to the views above expressed.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court en Banc.

WESTHUES, C. J., and LEEDY and HOLLINGSWORTH, JJ., concur.

DALTON, J., concurs in separate opinion filed.

STORCKMAN, J., dissents in separate opinion filed.

EAGER and HYDE, JJ., dissent and concur in dissenting opinion of STORCKMAN, J.

DALTON, Judge (concurring).

I concur in the principal opinion as written but I desire to add a further statement.

As we understand the facts of this case, the difficulty out of which Higgins' liability arose occurred on December 15, 1953, at a time when Higgins' contract with Interna-

tional was in full force and effect and also International's contract with General was in full force and effect; and it appears that General now admits the premium paid by Higgins was so divided that International kept the premium for the first $5,000 of liability and General received the excess premium for liability in excess of $5,000 or $10,000 depending on the circumstances, etc. Further, General's contract with International expressly provided that: "The liability of the Reinsurer shall follow that of the Company in every case and shall be subject in all respects to all the general and special stipulations, clauses, waivers and modification of the Company's policy, binder, or other undertaking and any endorsements thereon * * *." We further recognize that General's reinsurance contract also provided that: "Payments under this Agreement shall be made directly to the Company or to its liquidator, receiver or statutory successor on the basis of the liability of the Company under the contracts reinsured, without diminution because of the insolvency of the Company."

The question therefore is whether the court should give effect to this latter portion of the Higgins-General contract, particularly in view of the well-established public policy of this state, where it appears that at the time Higgins' liability arose he had the protection of his own policy supplemented by the reinsurance policy, both of which were intended for the purpose of discharging any judgment rendered against him in accordance with the provisions of the two policies.

The public policy of this state in respect to the application of insurance funds as to the payment of judgments against the insured in cases such as the one under consideration here is fully stated in Section 379.195 and Section 379.200 RSMo 1949, V.A.M.S. and the provisions of these sections were in full force and effect when the insurance contracts in question became effective. The provisions of these statutes made void and ineffective every provision

of every policy of insurance in conflict therewith. Dyche v. Bostian, Mo.Sup., 233 S.W.2d 721, 724(4–6); Homan v. Employers Reinsurance Corporation, 345 Mo. 650, 136 S.W.2d 289, 295(2, 3), 127 A.L.R. 163.

While these sections do not necessarily apply to reinsurance contracts, as such, nevertheless when International's policy was issued to Higgins, the applicable provisions of Section 379.195 and Section 379.200 RSMo 1949, V.A.M.S., became and were a part of that contract of insurance as fully as if set out in the policy itself, and when International's policy, so modified by said statutes, was incorporated by agreement in General's contract with International, the provisions of International's policy, as modified by the said statutes, were incorporated in General's contract of reinsurance so that the liability of the reinsurer (General) followed the liability of International and was "subject in all respects to all the general and special stipulations, clauses, waivers and modification of the Company's policy, binder, or other undertaking and any endorsements thereon * * *" and General was bound thereby.

In the case of Metropolitan Life Ins. Co. v. Siebert (8th Cir.), 72 F.2d 6, the insurance company sought to avoid liability for an insane suicide on the ground that the policy provided for the suspension of the policy if the insured became insane. In ruling the issue presented the court applied the public policy of this state, as evidenced by the statutes thereinbefore referred to, and said: "The policy of insurance is a Missouri contract, made in Missouri, with a Missouri citizen, and is governed by the laws of Missouri, which are a part of the contract itself. The suicide statute above referred to has been held by the Supreme Court of the United States and by the Supreme Court of Missouri to be valid and binding upon insurance companies doing business in Missouri, and that inasmuch as it declares the public policy of that state any provision of a policy in conflict with it or which seeks to avoid its effect in whole or in part is void. In Whitfield v. Aetna

Life Insurance Co., 205 U.S. 489, loc. cit. 496, 27 S.Ct. 578, 580, 51 L.Ed. 895, the court said: 'We cannot agree with the learned courts below in their interpretation of the statute. The contract between the parties, evidenced by the policy, is, we think, an evasion of the statute, and tends to defeat the objects for which it was enacted. In clear, emphatic words the statute declares that in all suits on policies of insurance on life it shall be no defense that the insured committed suicide, unless it be shown that he contemplated suicide when applying for the policy. Whatever tends to diminish the plaintiff's cause of action or to defeat recovery in whole or in part amounts in law to a defense. * * * If, notwithstanding the statute, an insurance company may, by contract, bind itself, in case of the suicide of the insured, to pay only one tenth of the principal sum, may it not lawfully contract for exemption as to the whole or only a nominal part thereof, and, if sued, defeat any action in which a recovery is sought for the entire amount insured? In this way the statute could be annulled or made useless for any practical purpose. * * * "The statute is mandatory and obligatory alike on the insurance company and the assured. Its very object was to prohibit and annul such stipulations in policies, and it cannot be waived or abrogated by any form of contract or by any device whatever." ' The suspension clause in this policy would be binding if it were not prohibited by the Missouri law. But being prohibited no mere use of words which in effect avoid the law can render this clause binding. It is manifest that one of the purposes of the language in this policy is to defeat a recovery where an insane person commits suicide. This cannot be done."

We think the public policy of this state is such that this court, under the facts and circumstances appearing in this record, must disregard (as in conflict with the statutes) that portion of the Higgins-General contract providing that "Payments under this Agreement shall be made directly to

* * * its liquidator, receiver or statutory successor on the basis of the liability of the Company under the contracts reinsured * * *"; and that the judgment in question should be paid to the garnishor, plaintiff-appellant.

STORCKMAN, Judge (dissenting).

I do not disagree with that part of the majority opinion which holds the reinsurance agreement entered into between International and General to be insurance against liability and not an indemnity agreement, but I cannot concur with the holding that the judgment creditor Whiteley and the judgment debtor Higgins are third parties to the insurance agreement in preference to International and after its insolvency to the superintendent of insurance, the named beneficiaries.

I believe that Article III of the reinsurance contract is decisive and controlling not only on the question of whether the contract is one of liability or indemnity, but also on the question of who is entitled to collect the amount due under the policy. The majority opinion accepts the provisions of Article III as decisive of the liability issue but rejects and undertakes to explain away its designation of the Company and its liquidator as the named beneficiaries of the policy. Also the majority and concurring opinions fail to consider and give effect to the insolvency statutes applicable to all insurance companies, although the question was properly presented by the superintendent.

Article III is entitled "LIABILITY OF REINSURER" and reads as follows:

"The liability of the Reinsurer shall follow that of the Company in every case and shall be subject in all respects to all the general and special stipulations, clauses, waivers and modifications of the Company's policy, binder, or other undertaking and any endorsements thereon; and no error or omissions in reporting any risks reinsured hereunder shall invalidate the

liability of the Reinsurer, but the reporting of reinsurance not authorized by this Agreement or by special acceptance hereunder, shall not bind the Reinsurer, except for the return of premiums paid therefor.

"*Payments under this Agreement shall be made directly to the Company or to its liquidator, receiver or statutory successor on the basis of the liability of the Company under the contracts reinsured,* without diminution because of the insolvency of the Company." Emphasis added.

The remainder of this article deals with the procedure for handling of claims in the event of the Company's insolvency and with the reinsurer's rights to participate in their investigation and defense. It is not material to the questions here involved.

The first paragraph of Article III provides a convenient yardstick to measure General's liability under the reinsurance contract; in short it shall be liable when International is. But it does not say specifically to whom the insurer is bound. The second paragraph names the beneficiaries to whom the amount of the liability shall be paid. The payments to the Company or its liquidator are to be *on the basis* of the Company's liabilities under the contracts reinsured. Unless the right of International to designate itself and its liquidator as beneficiaries is taken away by law, or otherwise released or dissipated, there is no valid reason for denying the superintendent's right to recover as liquidator of International's business.

I do not consider Homan v. Employers Reinsurance Corp., 345 Mo. 650, 136 S. W.2d 289, 127 A.L.R. 163, or O'Hare v. Pursell, Mo., 329 S.W.2d 614, to constitute any authority on the issue of whether the superintendent of insurance or the judgment creditor is entitled to recover. The superintendent was not a party to either of those cases. Homan was an equity action in the nature of an equitable garnishment. The plaintiff and his wife obtained judgments, a part of which were paid before the insurer of the original defendant became insolvent. The equity action was by the judgment creditor against the reinsurer of the primary insurer. The primary insurer became insolvent in 1931 and the receivership was concluded in 1934. The plaintiffs' judgments were not final at the time of the receivership and no claim was made. The reinsurer had furnished counsel and defended plaintiffs' actions. There were other circumstances indicating an assumption of the risk by the insurer. The plaintiffs were permitted to recover from the reinsurer the balance due on the judgments.

O'Hare v. Pursell was a third-party proceeding. The original defendant paid the judgment and sought to recover the amount so paid from Missouri Union Insurance Company, reinsurer of the primary company, the then insolvent Insurance Company of Texas. In other words, the judgment debtor paid the judgment against him and then proceeded against the reinsurer of the insolvent primary carrier. The opinion recites facts from which it concludes that the reinsurer took over and assumed the casualty business of the primitive company. Again this was a situation in which the court held that the contract was more than reinsurance, and that it was in effect an assumption of the business by the reinsurer. Again the liquidator of the reinsurer which was a Texas company was not a party to the action and there was no controversy to be determined between the liquidator and either the judgment creditor or the judgment debtor.

I think the results of the Homan and O'Hare cases are proper, but their application should be limited to the facts and circumstances in each case. They did not involve the additional questions present in this case. The superintendent's rights as liquidator were not in issue and the reinsurance contracts in those cases had no provisions comparable to Article III of the present agreement.

The majority and concurring opinions are not entirely clear regarding the extent to which §§ 379.195 and 379.200 are relied upon to establish privity and a direct access to the proceeds of the reinsurance contract. At one place they are referred to as establishing a "public policy". But if they are relied on at all, they would have to overcome the specific provisions of the contract and other cognate statutes. The rights of a judgment creditor against a policy of automobile liability insurance are derivative and ordinarily are the rights of the person insured. Pennsylvania Casualty Co. v. Phoenix, 10 Cir., 139 F.2d 823, 827.

There is specific statutory authority for an insurance company to reinsure *itself*. Section 379.125 provides: "Any company or association, other than life, organized under the provisions of sections 379.010 to 379.160, may cause *itself* to be wholly or partially reinsured *against any loss arising from any risk which it may have undertaken*, * * * or may *join* with any such corporation *in any such risk*, and may make and enter into all manner of contracts relating to such *reinsurance* and *joint insurance*, and the terms upon which the same shall be conducted." Emphasis added. The statute is express authority for the sort of reinsurance contract which provides that payments in discharge of the reinsurer's liability *shall* be made *directly* to the reinsured company or its liquidator. The Homan case recognizes that the contract may be so drawn. 136 S.W.2d 289, 301[28].

This court has characterized the importance of statutes regulating insurance companies in this fashion: "The original Code and amendments thereto indicate an intention to regulate the business from beginning to end, thereby protecting individual and public interests. The enactment of this comprehensive Code made the state a real party in interest. The superintendent of insurance is the administrative officer in charge of that interest, and courts are without authority to interfere with his administration of the Code." State ex rel. Missouri State Life Ins. Co. v. Hall, 330 Mo. 1107, 52 S.W.2d 174, 177[3]. The Hall case prohibited the liquidation of an insurance company by anyone other than the superintendent in the manner provided by the insurance Code. See also Jacobs v. Leggett, Mo., 295 S.W.2d 825, and Barker v. Leggett, Mo., 295 S.W.2d 836.

The majority and concurring opinions do not undertake to say that §§ 379.195 and 379.200 apply to a reinsurance contract so as to establish a direct right of recourse by the judgment creditor and the judgment debtor to the proceeds of reinsurance. The opinions say these statutes establish a "public policy" but they do not evaluate the remainder of the insurance Code and especially the liquidation statutes although their application is presented by the superintendent as a question for decision. Under these statutes the superintendent is authorized to institute proceedings in the Circuit Court of Cole County to dissolve and wind up any insurance company including reciprocals for the reasons provided by law. Section 375.-560. Upon final judgment declaring a company insolvent and dissolving it, "all the assets of such company shall vest in fee simple and absolutely in the superintendent * * * who shall hold and dispose of the same for the use and benefit of the creditors *and policyholders* of such company and such *other persons* as *may be interested in such assets.*" Section 375.650. Emphasis added.

Section 375.670 provides for the presentation and allowance of claims against the insolvent company and § 375.700 for the distribution of the assets to certain categories of expenses and claimants. The category of "matured policy claims" are payable after expenses of liquidation and taxes but ahead of general creditors. Section 375.720 makes it a penal offense for a person to withhold property of the insolvent company. These statutes demon-

strate a plan for the orderly and equitable marshalling of assets of an insolvent company and the payment of claims in the court where the liquidation proceedings are pending. For example, the inherent powers of courts of equity to allow and impress a lien for attorney fees have been superseded by the insurance statutes. Robertson v. Missouri State Life Ins. Co., Mo.App., 136 S.W.2d 362; Strubinger v. Mid-Union Indemnity Co., Mo.App., 352 S.W.2d 397. In addition to the grant of specific powers, the liquidating court is vested with these broad and apparently all inclusive powers, § 375.700, subd. 4: "The court may make all orders and decrees necessary and proper with reference to the title, possession, disposition, and distribution of all assets and the allowance and satisfaction of claims against the dissolved company, and in any other manner relating to its affairs and business." This would seem sufficient to provide a forum for the adjudication of all of plaintiff's claims and still preserve the integrity of the insurance Code.

The automobile accident which gave rise to these personal injury claims occurred on December 12, 1953, while both the primitive and reinsurance contracts were in force. On August 27, 1954, Mr. and Mrs. Whiteley filed separate suits against Higgins. International employed attorneys to defend the actions. Mrs. Whiteley obtained a judgment in her favor for $7500 on February 14, 1956, which judgment was paid in full. On January 16, 1957, before the husband's suit for loss of services was brought to trial, the superintendent instituted liquidation proceedings against International in the Circuit Court of Cole County. The attorneys hired by International then withdrew, and counsel for Mr. Whiteley notified both the superintendent and General, the reinsurer, of the action and invited them to defend but neither appeared for the trial at which on April 24, 1957, Mr. Whiteley obtained a judgment for $5000 against Higgins. This judgment is the basis of the pending garnishment proceeding against General. The superintendent over his protest was brought into the proceedings on motion of General. The trial court held that General was liable and that the superintendent was the person entitled to recover the amount due.

The superintendent was vested with title to all of International's assets before the plaintiff obtained his judgment. Further General did not take over the litigation and undertake to defend as the reinsurer did in the Homan case thereby establishing privity. 136 S.W.2d 289, 300 [17]. It is my view that the plaintiff's judgment at best became a claim which should have been asserted in the liquidation proceedings either on the trust theory which is Point III of plaintiff's brief or as a "matured policy claim" under § 375.700, subd. 1(3). I am inclined to believe it belongs in the latter category.

The force and effect of these liquidation statutes are not determined by either the majority or concurring opinion. These issues were not in Homan v. Employers or O'Hare v. Pursell because the superintendent was not a party and there was no adverse claim on his behalf. The majority opinion goes to great lengths to demonstrate that Whiteley, the judgment creditor, and Higgins, the judgment debtor, were both third-party beneficiaries of the reinsurance but never quite, in my opinion, achieves that result and ends up by assuming it. On the other hand, both opinions ignore the superintendent's statutory rights and undertakes to explain away his specific designation as a named beneficiary or successor in interest to the Company in the event of its insolvency.

The reinsurance contract, Article III, clearly provides that: "Payments under this Agreement *shall* be made *directly* to the Company or to its liquidator * * *." Emphasis added. This portion of Article III plainly designates to whom the amount of the reinsurer's liability shall be paid. It is commonly referred to as an insolvency clause. The language is not ambigu-

ous; hence there is no room for construction and the words must be given their plain, ordinary and usual meaning. State ex rel. Prudential Ins. Co. v. Bland, 353 Mo. 956, 185 S.W.2d 654, 656 [3].

I can find no basis for the implication or supposition of the majority opinion that this clear and unlimited provision was intended to apply only when International had first paid the entire loss and General was obligated to reimburse it for the amount reinsured. If this were so, then the reinsurance contract would be in effect an *indemnity* policy as far as International or its liquidator is concerned (although they are specifically designated as beneficiaries) and a *liability* policy as to all other unnamed persons who may be held to be or become third-party beneficiaries.

Courts cannot by implication extend or restrict a contract in relation to any matter that is specifically covered by written terms; there can be no implication against the express terms of the contract. Forir v. Toman, Mo., 202 S.W.2d 32, 34 [4]; Cameron, Joyce & Co. v. State Highway Commission, 350 Mo. 389, 166 S.W.2d 458, 460 [3, 4]; Sandy Hites Co. v. State Highway Commission, 347 Mo. 954, 149 S.W.2d 828, 833–834 [3, 4]. The majority opinion does not give the payment clause its plain and ordinary meaning. I can find no justification in the law or the facts for indulging in implication or speculation contrary to the express provisions of the contract.

As previously stated, a provision such as Article III was not in the reinsurance contracts involved in Homan v. Employers and O'Hare v. Pursell. Its effect has never been decided by any case in this state. In other jurisdictions a similar article and insolvency clause has been held to mean just what it says, that in the event of insolvency the amount due under the policy shall be paid to the liquidator. Melco System v. Receivers of Trans-America Ins. Co., 268 Ala. 152, 105 So.2d 43, 46; Stick-

el v. Excess Ins. Co. of America, 136 Ohio St. 49, 23 N.E.2d 839, 841; Greenman v. General Reinsurance Corp., 237 App.Div. 648, 262 N.Y.S. 569, 570, aff'd 262 N.Y. 701, 188 N.E. 128. I cannot agree that this issue was involved in or has been determined by the Homan case.

Alabama has statutes apparently identical with our §§ 379.195 and 379.200, but, nevertheless, in Melco System v. Receivers, its Supreme Court held that such statutes do no more than establish privity between the injured judgment creditor and the primitive insurer and that they do not apply to a reinsurer. Unless this court can make a clear cut decision that General *joined* in or *assumed* the risk so as to incur a direct contractual relation with Higgins, the result of the majority opinion is untenable. The majority opinion would wipe out all distinctions between reinsurance and joint insurance as recognized by § 379.125.

This court cannot be concerned with the wisdom of the legislative policy of distributing the assets of an insolvent company (including the proceeds of reinsurance) among creditors in various classes (including matured policy claims) rather than to one judgment creditor as a preferred creditor. The legislature has made that determination in the insolvency statutes of the insurance Code. In the circumstances of this case §§ 379.195 and 379.200 cannot be said to be controlling as a statement of "public policy" or to create a preference contrary to the liquidation statutes of the insurance Code and the express directions of the insolvency clause.

I doubt if the superintendent should have been made a party to this action, but that issue is not now before us. I am inclined to think that the entire controversy should have been litigated initially in the Circuit Court of Cole County. That seems to be contemplated by the insurance Code. Nevertheless, under the circumstances, I would affirm the judgment.