**J.C. PENNEY LIFE INS. CO., Appellant,**

v.

**TRANSIT CASUALTY COMPANY IN RECEIVERSHIP, Respondent.**

**No. WD 69819.**

Missouri Court of Appeals, Western District.

Sept. 29, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 24, 2009.

Application for Transfer Denied Jan. 26, 2010.

James K. Lowry, Esq., Jefferson City, MO, for appellant.

James C. Owen, Esq., Chesterfield, MO, for respondent.

Before DIVISION ONE: ALOK AHUJA, Presiding Judge, JAMES M. SMART and LISA WHITE HARDWICK, Judges.

LISA WHITE HARDWICK, Judge.

This case arises from a proof of claim filed by J.C. Penney Life Insurance Company ("Penney") against the receivership for Transit Casualty Company ("Transit") pursuant to a "Reinsurance Agreement." The Cole County Circuit Court entered a judgment finding that the agreement between Penney's predecessor in interest, Beneficial Fire & Casualty Company (BF & C), and Transit is, in fact, a reinsurance agreement and not a contract of insurance. Based upon this finding, the circuit court determined that Penney's claims against the Transit receivership are Class 5 general creditor claims pursuant to Section 375.700.1(5), RSMo 2000.[1] Penney appeals the judgment, contending that its claims arise from a contract of insurance and, therefore, should be prioritized as Class 3 policy claims under Section 375.700.1(3).

For reasons explained herein, we affirm the circuit court's judgment.

## FACTUAL AND PROCEDURAL HISTORY

In 1966, BF & C and Transit were two of nine companies comprising the Beneficial Insurance Group ("BIG"). Transit was a subsidiary of Beneficial Standard Life Insurance Company ("BSLIC"), the parent company of BIG.

On September 1, 1966, BF & C and Transit entered into a contract titled "Reinsurance Agreement," which became effective on September 30, 1966. Pursuant to the agreement, BF & C ceded, and Transit agreed to reinsure, 100% of BF & C's liability for all claims and losses arising from twelve classes of its insurance business. In return, BF & C paid Transit 100% of the dollar reserves on these classes of business, 100% of the unearned premiums on policies written before September 30, 1966, and 100% of the premiums on all policies written after that date.

On September 29, 1966, BSLIC and BF & C, both California corporations, and Transit jointly petitioned the California Department of Insurance for permission to enter into the Reinsurance Agreement. The California Department of Insurance consented to the Reinsurance Agreement in October 1966.

Around the same time, Penney and BSLIC entered into a memorandum of understanding detailing Penney's acquisition of BF & C from BSLIC. In January 1967, Penney and BSLIC signed a purchase agreement by which Penney bought the outstanding capital stock of BF & C.

In 1985, the Cole County Circuit Court placed Transit into receivership. In November 1990, Penney tendered two claim

---

1. All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise indicated.

notices, made under BF & C policies, to Transit's special deputy receiver. Penney asserted that, pursuant to the 1966 Reinsurance Agreement, "Transit reinsured all claims and losses arising under the policies."

In 1992, Penney filed a proof of claim for one of the two claims against the Transit receivership. Penney filed the claim using an "Official Claim Form for Reinsurance Claims." Under the section of the form denoted, "Coverage Description," Penney stated, "Risk under liability policy No. CPC–44149, Issued by [BF & C] to Los Angeles County Sanitation Districts, 100% reinsured with Transit, for damages to property caused by accident." On the post-bar date explanation form attached to the proof of claim, Penney described its claim against the receivership as follows: "Transit reinsured the ceding company (claimant) under a Reinsurance Agreement dated September 1, 1966. The claim against Transit Casualty is for 100% indemnification for CERCLA claim against claimant's policyholder."

In December 2000, Transit's special deputy receiver issued a notice of determination that consented to "all claims" filed by Penney. The receiver assigned the claims a Class 5 priority under Section 375.700.1(5).[2] Section 375.700.1 allowed the receiver to classify claims for payment from a dissolved insurer's assets in the following order of priority:

(1) To payment of all the expenses of closing the business and disposing of the assets of such insurer;

(2) To the payment of all lawful taxes and debts due the state and the counties and municipalities of this state;

(3) To the payment of policy claims;

(4) To the payment of debts due the United States;

(5) To the payment of the other debts and claims allowed against such insurer, and the unearned premiums and the surrendered value of its policies, in proportion to their respective amounts.

The special deputy receiver informed Penney that there would not be sufficient funds to reimburse 100% of the Class 3 creditor claims and, consequently, no assets would be available to pay any of Transit's obligations to Class 5 creditors.

In January 2001, Penney filed a request for review of the special deputy receiver's notice of determination. Penney objected to the Class 5 claimant determination and asserted that it should be a Class 3 claimant. Specifically, Penney contended "that it is a policyholder under the Reinsurance Agreement, which provided that Transit Casualty Company would reinsure 100 percent of BF & C's liability for all claims

**2.** Transit's special deputy receiver actually classified Penney's claims as Class 4 claims under the 1994 version of Section 375.700.1, because general creditor claims were Class 4 claims under that version of the statute. The receiver acknowledged, however, that Section 375.700.1 was amended in 1996, reclassifying general creditor claims as Class 5 claims. § 375.700.1, RSMo Cum.Supp.1996. The receiver indicated that the reclassification would have no effect on the Transit receivership because the new Class 4 encompassed claims by the federal government, and no claims of this type were expected. In the judgment, the circuit court cited the 2000 version of Section 375.700.1, which continued to classify general creditor claims as Class 5 claims. Section 375.700 was repealed in August 2007. Claims are now classified pursuant to Section 375.1218, RSMo 2000. Under Section 375.1218, policy claims are classified as Class 3 claims and general creditor claims are classified as Class 5 claims. For consistency's sake, this court will refer to the same version of the statute as the circuit court did, Section 375.700.1, RSMo 2000, and refer to policy claims as Class 3 claims and general creditor claims as Class 5 claims.

and losses arising from enumerated lines and classes of its business."

In light of these objections, the special deputy receiver certified the following two questions for determination by the Cole County Circuit Court pursuant to Local Rule 75.8:

1. Is the "Reinsurance Agreement" entered into between Transit Casualty Company and Beneficial Fire and Casualty Company effective 9/30/66 a contract of insurance or a reinsurance agreement?

2. Depending on the outcome of the first [question], what is the creditor classification of J.C. Penney's claims?

The court held a status conference in June 2002, during which the parties agreed to submit the certified questions to a special master. Transit and Penney conducted discovery and subsequently stipulated to the documents relevant to the certified questions. Penney filed "Suggestions in Support of Class Three Priority," and Transit filed "Suggestions in Opposition to Class Three Priority."

The special master filed a report with findings of fact, conclusions of law, and recommendations regarding the certified questions on January 7, 2008. Initially, the special master stated that both he and the parties agreed that the Reinsurance Agreement is unambiguous and, therefore, "no extrinsic evidence is necessary in aid of its interpretation."

The special master noted that Penney's objection proceeded from the premise that the terms of the Reinsurance Agreement give BF & C's policyholders a right of direct action against Transit and, therefore, the policyholders are third-party beneficiaries of the Reinsurance Agreement. Penney asserted that, where it, as BF & C's successor, satisfied obligations to those policyholders that Transit should have satisfied, Penney became subrogated to the policyholders' right of direct action against Transit.

The special master rejected Penney's position, finding that Missouri law "is clear that a reinsurance agreement provides no rights to reinsurance proceeds from the Reinsurer (Transit) to a policyholder (BF & C/Penney's policyholders) in an insolvency absent extremely clear language to that effect." The special master noted that the Reinsurance Agreement contains provisions in addition to standard reinsurance language, but he concluded the additional provisions do not clearly express that the contracting parties intended that policyholders be third-party beneficiaries of the contract with the right to maintain an action against Transit.

The special master determined that, even though the Reinsurance Agreement contains "more than just standard reinsurance," it is a reinsurance agreement and not an insurance contract. Because Penney's claims are reinsurance claims, the special master concluded that they are properly classified as Class 5 general creditor claims and not Class 3 policy claims under Section 375.700.1.

Penney filed objections to the special master's report. Following oral argument, the circuit court ruled that "the law and the facts justify entry of a judgment in accordance with the Special Master's recommendation." The court specifically rejected Penney's contention that the "true intent" of the parties was that the Reinsurance Agreement would not be a standard reinsurance agreement but, instead, would give BF & C's policyholders a direct right of action against Transit to which Penney was now subrogated. The court noted that the petition that Transit filed with the California Department of Insurance requesting permission to enter into the Rein-

surance Agreement did not support such an interpretation about the parties' intentions. The circuit court adopted the special master's findings and conclusions and certified the judgment as final for purposes of appeal pursuant to Rule 74.01(b). Penney appeals.

## STANDARD OF REVIEW

■ We will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, it erroneously declares the law, or it erroneously applies the law. *Viacom, Inc. v. Transit Cas. Co.,* 138 S.W.3d 723, 724 (Mo. banc 2004). In this case, the parties agree on all of the essential facts. When only legal issues are at stake, we review the circuit court's judgment *de novo. Id.*

## ANALYSIS

■ In its sole point on appeal, Penney contends the circuit court erroneously relied upon regulatory documents related to the Reinsurance Agreement and the "flawed reasoning" of the special master in prioritizing Penney's claim as a Class 5 reinsurance claim. Citing *O'Hare v. Pursell,* 329 S.W.2d 614 (Mo.1959), Penney argues that the Reinsurance Agreement effectively operates as an insurance contract that gives policyholders a direct right of action against Transit. Because Penney's claim arises from the subrogation of the policyholder's right of direct action, Penney contends it must be prioritized as a Class 3 policy claim.

■ Resolution of this issue requires this court to interpret the Reinsurance Agreement. "The cardinal rule of contract interpretation is to ascertain the parties' intention and to give effect to that intention." *Newco Atlas, Inc. v. Park Range Constr., Inc.,* 272 S.W.3d 886, 891 (Mo. App.2008) (quotation marks omitted).

When the language of the contract is unambiguous, we ascertain the parties' intent from the contract language alone and not from extrinsic or parol evidence. *Id.* The prohibition against considering extrinsic evidence in unambiguous contracts extends to considering the circumstances surrounding the contract's execution. "Circumstances surrounding the contract's execution may only be examined when the court finds an ambiguity in the original articles." *Executive Bd. of Mo. Baptist Convention v. Windermere Baptist Conference Ctr.,* 280 S.W.3d 678, 696 (Mo.App.2009). In this case, the parties agree that the language of the Reinsurance Agreement is unambiguous. Therefore, we will not examine extrinsic evidence to interpret the Agreement. *Kyte v. Am. Family Mut. Ins. Co.,* 92 S.W.3d 295, 298 (Mo.App. 2002).

A reinsurance agreement is a contract of indemnity. 14 ERIC MILLS HOLMES & L. ANTHONY SUTIN, HOLMES' APPLEMAN ON INSURANCE 2D § 102.1 (2000). In a reinsurance agreement, "[o]ne insurance company is indemnified by another insurance company for all or parts of losses suffered by the former under the contracts of direct insurance that it has issued to its policyholders." *Id.* (footnote omitted). The reinsurer agrees to protect the reinsured company either wholly or partially from risks the reinsured company has undertaken. *Id.* The direct insurance policies between the reinsured company and its original insured remain in effect at the same time as the reinsurance agreement between the reinsured company and the reinsurer. *Id.*

■ Ordinarily, the original insured has no interest in the reinsurance. *Id.* Indeed, a reinsurance contract "operates solely as between the reinsurer and the reinsured. It creates no privity between the original insured and the reinsurer."

*O'Hare,* 329 S.W.2d at 620. This is because the contract of insurance and the contract of reinsurance are "totally distinct and unconnected." *Id.* "An ordinary contract of reinsurance is one of indemnity against loss, and no action will lie until the loss has been paid." *Id.* The reinsurer is "solely and exclusively" liable to the reinsured and has no contractual obligation or liability to the original insured. *Id.*

Nevertheless, barring any statutory restrictions against it, a reinsurance contract may be drafted in such a way as to make the reinsurer liable to both the reinsured company and the original insured. *Id.* If the reinsurer assumes the liability of the reinsured company on its policies, then the policyholders, or their privies, may directly enforce this liability against the reinsurer. *Id.* As the Missouri Supreme Court explained in *O'Hare:*

> [W]here, in reinsuring risks for which policies are outstanding, reinsurer contracts with reinsured to assume the policies and to pay the holders thereof all such sums as reinsured may become liable to pay, the persons to whom these original policies are payable acquire a direct right of action against reinsurer, and may sue in their own names and recover on the contract of reinsurance.

*Id.* (quotation marks omitted).

To give policyholders a direct right of action against a reinsurer, however, the reinsurance agreement must directly and clearly create third-party liability. *Allendale Mut. Ins. Co. v. Crist,* 731 F.Supp. 928, 931 (W.D.Mo.1989). "The contract terms must clearly express that the contracting parties intended the third party to be the beneficiary of performance of the contract and have the right to maintain an action on the contract." *Id.* at 930–31. Because parties usually contract and stipulate for themselves and not third parties, "a strong presumption arises that

such was their intention, and the implication to overcome that presumption must be so strong as to amount to an express declaration." *Id.* at 931. "[T]he court may not speculate from the language in the contract that the contracting parties wanted to make the [policyholder] a third party beneficiary." *Id.* (quotation marks omitted).

In *O'Hare,* 329 S.W.2d at 621–22, the Missouri Supreme Court found that a treaty of reinsurance contained language that clearly indicated that the original insureds were third-party beneficiaries of the treaty and, therefore, could maintain a direct action against the reinsurer. The Court found that the treaty of reinsurance was "not merely an agreement between two insurance companies whereby one agrees to indemnify the other against losses or amounts actually paid on judgments or claims." *Id.* at 621. Instead, the "reinsurer specifically and in clear terms assumed the total liability of reinsured on its outstanding policies and agreed to service, adjust and settle obligations directly with the insureds on their losses." *Id.*

Penney contends the Reinsurance Agreement in this case is "remarkably similar" to the treaty of reinsurance in *O'Hare.* Penney notes that, like the reinsurer in *O'Hare,* Transit also agreed to accept 100% liability on BF & C's policies and to be responsible for investigating, defending, and adjusting all claims. Thus, Penney argues that BF & C's policyholders are third-party beneficiaries of the Reinsurance Agreement with a direct right of action against Transit.

Unlike the provisions in the Reinsurance Agreement, however, the provisions in the treaty of reinsurance in *O'Hare* clearly indicated that the reinsurer agreed to deal directly with and assume direct obligations to the policyholders of the reinsured poli-

cies. The treaty of reinsurance in *O'Hare* stated that "the reinsurer will service, adjust and settle obligations *directly with the insureds* whose policies are reinsured hereunder." *Id.* at 616 (emphasis added). While Transit agreed in the Reinsurance Agreement to be "responsible for the investigation, defense or adjustment of all claims arising from the business reinsured," Transit did not agree to undertake any of these obligations *directly* with BF & C's policyholders.

Likewise, there is nothing within the four corners of the Reinsurance Agreement indicating that Transit agreed to service the reinsured policies. In contrast, the treaty of reinsurance in *O'Hare* expressly stated that the reinsurer agreed to "service and handle" the reinsured policies:

> "[T]he reinsurer shall, as reinsurer hereunder, service and handle all policies and obligations to insureds which are reinsured hereunder, and the ceding company agrees that the reinsurer may settle all obligation and claims in this connection in such manner as it may deem necessary and at its discretion and that it may commence, defend, compromise or withdraw from action, suits, or prosecutions, and in general do all things that it may deem expedient in connection with its servicing and handling the business reinsured."

*Id.* at 616–17. The treaty further provided that the reinsurer "agreed 'to exercise the highest faith and trust in connection with handling the affairs and obligations of the ceding company so as to preserve and enhance the reputation of said ceding company with the insuring public.'" *Id.* at 617. That the reinsurer in *O'Hare* not only explicitly agreed to service and handle the reinsured policies, but also explicitly agreed to do so in good faith, clearly indicated the parties' intention that the

reinsurer be directly obligated to the original insureds.

The language of the treaty of reinsurance in *O'Hare* expressly obligated the reinsurer to deal directly with, and for the benefit of, the original insureds. Such language constituted clear evidence that that the reinsurer and reinsured company intended that the original insureds be third-party beneficiaries of the treaty of reinsurance and contemplated that the original insureds would have a direct right of action against the reinsurer. Such a conclusion is further compelled by the fact that the treaty of reinsurance specifically provided for defenses the reinsurer could assert in a direct action brought by the original insureds:

> "Provided, however, that in the event of an action by the insured directly against the Reinsurer ... for the use and benefit of the insured, the Reinsurer shall be entitled to assert any of the defenses available to it under Article III hereof."

*Id.* at 621. Although Penney discounts the importance of this provision, the Supreme Court specifically cited this language as evidence that the parties "contemplated the possibility that the original insureds would undertake to enforce their rights directly against reinsurer" and that the treaty of reinsurance "was for the benefit of the policyholders." *Id.*

In the Reinsurance Agreement in this case, Transit obligates itself only to BF & C, and the express terms of the Agreement indicate that Transit's obligation to BF & C is one of indemnification. Indeed, in providing for Transit to pay any claims or loss expenses that BF & C may incur on the reinsured policies, the Agreement states that Transit will "reimburse" BF & C for those expenses. Use of the term "reimburse" shows that the parties contemplated that BF & C, and not Transit, would initially incur such expenses.

Additionally, the Agreement indicates that BF & C would not only initially incur the expenses, but BF & C would also initially collect the premiums and remit those premiums, along with a written report, to Transit each month. The clear language in the treaty of reinsurance in *O'Hare* that created the direct connection between the reinsurer and the original insureds, making the original insureds third-party beneficiaries and explicitly obligating the reinsurer directly to them, is simply not present in the Reinsurance Agreement.

Penney failed to overcome the strong presumption that the Reinsurance Agreement only obligated Transit to indemnify or reinsure BF & C for its losses on insurance contracts. The Reinsurance Agreement did not make Transit directly liable to BF & C's policyholders; hence, BF & C's policyholders have no direct right of action against Transit. Based on the plain language of the Reinsurance Agreement, we agree with the special master's finding that it is a contract for *reinsurance,* and not an insurance contract, because it does not directly and clearly create third-party liability.

Penney's claims derive from the Reinsurance Agreement and are, therefore, reinsurance claims against the Transit receivership. The parties agree that reinsurance claims are subject to Class 5 priority as general creditor claims. Penney further concedes that its claims are not entitled to Class 3 priority if they are deemed reinsurance claims. Accordingly, the special master correctly classified Penney's claims as Class 5 claims under Section 375.700.1(5).

We find no error in the circuit court's entry of judgment based on the special master's report. The report alone is sufficient to support the court's determination that Penney's reinsurance claims must be prioritized as Class 5. Although Penney contends the court erred in referencing extrinsic evidence of the 1966 regulatory approval process for the Reinsurance Agreement, we conclude that evidence was merely cumulative and unnecessary to support the legal grounds adopted in the special master's report. The point on appeal is denied.

### CONCLUSION

We affirm the circuit court's judgment.

All Concur.