

# In the Missouri Court of Appeals
## Eastern District

### DIVISION FOUR

| | | |
|---|---|---|
| WILLIE LEONBERGER, | ) | No. ED103669 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court of |
| | ) | the City of St. Louis |
| vs. | ) | |
| | ) | Honorable David L. Dowd |
| MISSOURI UNITED SCHOOL INSURANCE COUNCIL, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| UNITED EDUCATORS, A RECIPROCAL RISK RETENTION GROUP, | ) | |
| | ) | |
| Defendant/Appellant. | ) | Filed: May 24, 2016 |

### Introduction

United Educators, A Reciprocal Risk Retention Group (Appellant) appeals from the trial court's Order and Judgment denying Appellant's Motion to Compel Arbitration and granting Willie Leonberger's (Respondent) Motion to Stay Arbitration. We affirm.

### Factual and Procedural Background

#### Accident

In 2011, Respondent drove a school bus for the North Callaway R-1 School District (District). The District was Respondent's employer. On January 18, 2011, Respondent was

driving the bus when he accidentally struck and killed student Hunter Pitt (Pitt) after Pitt

disembarked the bus.

Insurance Coverage

I.  MUSIC Policy

The District was a member of and procured liability insurance for its bus drivers from the

Missouri United School Insurance Council (MUSIC).[1] Arthur J. Gallagher Risk Management

Services (Gallagher Services) was MUSIC's claims administrator.  The District's MUSIC policy

had limits of $2,500,000 per occurrence.  "Occurrence" was defined by the MUSIC policy to

mean an accident.  The MUSIC policy stated:

> [W]e have the right and duty to investigate, defend and settle any Claim or
> Occurrence to which this Coverage Agreement applies….An excess insurance
> policy or reinsurance contract may provide coverage to members of MUSIC once
> the loss exceeds a certain dollar amount.  Thus, any loss is subject to the terms,
> language and conditions of the particular excess insurance policy or contract, if
> applicable….It is this excess insurance that allows the Program to cap large losses
> at an affordable level, but allows MUSIC, through its claims administrators, to
> manage and control all losses within the self-insured retention....

II.  FRA Policy

For liability claims, MUSIC entered into a "Facultative Reinsurance Agreement" (FRA)

with Appellant to provide all coverage under the MUSIC policy in excess of $500,000.  The

FRA provides in paragraph 2 that Appellant's liability would "follow that of [MUSIC] subject in

all respect to the terms, conditions, exclusions and limits of liability of [the MUSIC policy],

except when otherwise specifically provided herein."

In paragraph 4 of the FRA, Appellant declares MUSIC "must notify" Appellant "as soon

as practicable of any occurrence reasonably likely to involve" the FRA, so Appellant:

---

[1]MUSIC is a protected self-insurance program.  It was established in 1985 for the purpose of providing property and casualty coverage as well as risk management services under one comprehensive plan at a low cost for its members, which include public school districts, community colleges, and affiliated organizations in Missouri.

2

shall have the right and be given the opportunity:

> a. to approve in advance, counsel selected by a Covered Organization[2] (which we will not unreasonably withhold or delay) or to require the Covered Organization to revoke that counsel's appointment....
> b. to be associated at our own expense with the Covered Organization or the Covered Organizations underlying Covered Parties as defined under the Reinsured's Memorandum of Coverage, or both, in the defense and control of claims, or the trial of any suits or other legal proceedings, relative to any occurrence that in Reinsurer's opinion, may create liability for Reinsurer under the terms of this agreement, in which event the Covered Organization shall cooperate with Reinsurer in all things in the defense of that claim, suit, or other legal proceeding; or
> c. at the Reinsurer's sole option, to take over the defense of any claim, suit, or legal proceeding and to exercise the DEFENSE AND SETTLEMENT rights of Reinsured that are contained in its Memorandum of Coverage.

(Emphasis in original.)

The FRA provides with regard to settlement:

> [Appellant] will not settle any claim without the agreement of [MUSIC]. If [MUSIC] or any Covered Organization refuses to consent to a reasonable settlement [Appellant] recommends that is acceptable to a claimant, our liability for losses associated with that claim is limited to the amount of Damages as defined under [the MUSIC policy] for which the claim could have been settled .... In addition, [MUSIC] and [Appellant] agree that notification of any settlement demand that involves [Appellant's] limit will be given to the [Appellant] by [MUSIC] prior to consenting to any settlement.

Proceedings

On January 19, 2011, MUSIC and Gallagher Services learned of the accident. MUSIC confirmed "coverage is applicable and there are no coverage issues on this Auto Liability Claim. No exclusions apply." It also recognized liability for Respondent was probable with "90-100% fault on the bus driver." MUSIC notified Appellant of the accident. Appellant acknowledged the claim and assigned claims attorney Rhonda Hurwitz (Hurwitz). The Pitts notified MUSIC that they had retained an attorney. MUSIC retained an attorney to represent Respondent.

---

[2]The FRA defines "Covered Organization" to mean the original insured, here the District, and "Covered Party" to mean an employee of the original insured, here Respondent.

3

Hurwitz asked Respondent's attorney to copy her directly on all emails and updates. Appellant requested a separate attorney represent the school district. Attorney Bob Numrich (Numrich) was retained for that purpose.

Criminal Case

On May 20, 2011, the Callaway County prosecuting attorney charged Respondent with second-degree involuntary manslaughter. MUSIC retained criminal attorney Rusty Antel (Antel) for Respondent. Antel advised Respondent to plead guilty to the prosecutor's charge. Pursuant to Antel's advice, Respondent pled guilty to the charge of second-degree involuntary manslaughter. Numrich provided MUSIC and Appellant with the details of Respondent's plea. Appellant informed MUSIC it was considering denying coverage based on Respondent's plea due to the MUSIC policy's (and hence, FRA policy's) exclusions in Section 19 (o) and (p) of coverage for criminal acts.

On December 16, 2011, MUSIC's claims adjuster wrote:

> Our intention all along was to get this to mediation. Now however, it appears [Appellant] may want to issue a reservation of rights due to the alleged criminal act of [Respondent]. [Respondent] may have been charged due to pressure by the family in this matter, but he was not convicted. This 79-year-old man pled out to keep from going to prison for involuntary manslaughter. The fact of the matter is, he was still in the course and scope of his duties as a district employee when this unfortunate accident occurred. We will have a conference call shortly to try and resolve this issue.

The following day, the supervising claims adjuster noted: "Now since criminal charges were filed and the driver signed the affidavit, there is a question from excess [Appellant] if there is coverage for the driver. Anita [Khiene (Khiene), an employee of Gallagher Services] has been notified and a conference call will be set up to discuss."

The Pitt family made a formal policy limits demand. Hurwitz e-mailed Respondent's attorney and Numrich and asked them to provide her with a copy of Respondent's sentencing

4

hearing transcript. The conference call was cancelled. The claims adjuster noted the Pitt family absolutely declined mediation, and Numrich relayed to the Pitts' attorney MUSIC was not going to tender their limits.

On January 18, 2012, the Callaway County circuit court sentenced Respondent to five years and suspended execution of sentence subject to probation and community service.

Civil Case

On February 14, 2012, the Pitts filed a wrongful death action against Respondent, the school district, the district transportation manager, and the district superintendent. A few days later, the supervising adjuster noted:

> [Respondent] has pleaded guilty and now excess carrier is advising that since bus driver pleaded guilty to stay out of jail, excess say[s] now there is no coverage for bus driver. We have just been notified that suit has been filed but not served and will need to discuss further with excess carriers.

Respondent's attorney prepared a litigation plan. By this point, Appellant's involvement was so significant Respondent's attorney addressed Respondent's litigation plan directly to Hurwitz. Respondent's attorney filed an Answer on Respondent's behalf, in which Respondent admitted to having acted negligently in causing Pitt's death. That same day, the conference call finally took place. The claims adjuster described the call as follows:

> Conference call was held. The plan going forward is [to] take the stance that coverage will be denied to [Respondent]. This will leave plaintiff recovery limited to the statutory cap which is now about $395K. That will give us leverage going forward to force this to mediation. We can say, either go to mediation and get realistic or coverage will be denied to [Respondent].

Hurwitz and Khiene asked for a draft reservation of rights letter. Claims adjuster Debra Walker (Walker) forwarded a draft to Hurwitz. The draft did not include exclusion 19(o). Hurwitz instructed the claims adjuster to add exclusion 19(o) to the letter. MUSIC and

5

Appellant issued a letter to District, but not Respondent or his attorneys, reserving rights to deny coverage due to the criminal acts exclusion in sections 19 (o) and (p) of the MUSIC policy.

In July of 2012, the Pitts' attorney contacted Respondent's attorney to advise that if there was a reservation of rights, his clients would be interested in a Section 537.065[3] agreement. That same day, Respondent's attorney contacted Appellant and MUSIC stating he was not aware of a reservation of rights. A week later, Respondent's attorney e-mailed MUSIC and Appellant requesting the reservation of rights be withdrawn. In response, the claims adjuster emailed Hurwitz the following:

> I have talked with Anita this morning and she directed me to you regarding this matter. It is my recommendation we rescind the reservation of rights and defend this matter. Otherwise, we are on the hook for not only the policy limits, but a Bad Faith Claim against MUSIC.

Appellant refused and Respondent's attorney was advised the reservation of rights would not be withdrawn. In August of 2012, Respondent entered into a Section 537.065 agreement with the Pitt family. In September of 2012, MUSIC filed a declaratory judgment action in Callaway County seeking a declaration that the policy afforded no coverage to Respondent. On

---

[3] All statutory references are to RSMo 2006. Section 537.065 provides a claimant and tort-feasor may contract to limit recovery to specified assets or insurance contract:

Any person having an unliquidated claim for damages against a tort-feasor, on account of bodily injuries or death, may enter into a contract with such tort-feasor or any insurer in his behalf or both, whereby, in consideration of the payment of a specified amount, the person asserting the claim agrees that in the event of a judgment against the tort-feasor, neither he nor any person, firm or corporation claiming by or through him will levy execution, by garnishment or as otherwise provided by law, except against the specific assets listed in the contract and except against any insurer which insures the legal liability of the tort-feasor for such damage and which insurer is not excepted from execution, garnishment or other legal procedure by such contract. Execution or garnishment proceedings in aid thereof shall lie only as to assets of the tort-feasor specifically mentioned in the contract or the insurer or insurers not excluded in such contract. Such contract, when properly acknowledged by the parties thereto, may be recorded in the office of the recorder of deeds in any county where a judgment may be rendered, or in the county of the residence of the tort-feasor, or in both such counties, and if the same is so recorded then such tort-feasor's property, except as to the assets specifically listed in the contract, shall not be subject to any judgment lien as the result of any judgment rendered against the tort-feasor, arising out of the transaction for which the contract is entered into.

December 3, 2012, the Pitt family tried its wrongful death case against Respondent in the circuit court of the City of St. Louis, after four changes of venue. On December 21, 2012, the trial court in the City of St. Louis entered judgment in favor of the Pitt family and against Respondent in the amount of $11,494,637.38. The Pitt family then began garnishment proceedings, which are currently on appeal in this Court. On April 3, 2013, the Callaway County circuit court dismissed MUSIC's declaratory judgment case, declining to rule based on the judgment rendered by the St. Louis City circuit court and subsequent garnishment proceedings.

On June 12, 2013, Respondent filed a lawsuit against MUSIC alleging bad faith refusal to settle and bad faith failure to defend. On July 10, 2015, the trial court granted Respondent leave to file a first amended petition adding a claim of breach of fiduciary duty against MUSIC and adding Appellant as a party defendant to the same three claims asserted against MUSIC.

On July 29, 2015, Appellant wrote Respondent's counsel purporting to demand and initiate arbitration pursuant to a provision in the FRA contract, which states:

> If any dispute should arise between the Reinsured and the Reinsurer with reference to the interpretation of this Agreement or their rights with respect to any transaction involved whether such dispute arises before or after termination of this Agreement, such dispute, upon the written request of either party shall be submitted to [an arbitration panel].

Respondent filed a motion to stay the threatened arbitration proceeding and Appellant filed a competing motion to compel arbitration. On October 15, 2015, the Court granted Respondent's motion and denied Appellant's motion. This appeal follows.

Points on Appeal

In its first point, Appellant claims the trial court erred in denying its motion to compel arbitration and granting Respondent's motion to stay arbitration because Respondent's third-party beneficiary claims are within the scope of the arbitration clause, in that the language of the

7

arbitration clause limiting arbitration to disputes between the parties does not exclude arbitration of purported third-party beneficiary claims.

In its second point, Appellant maintains the trial court erred in denying its motion to compel arbitration and granting Respondent's motion to stay arbitration because the arbitration clause in the reinsurance agreement is valid and enforceable under Section 435.350, in that the reinsurance agreement is a reinsurance contract and not an insurance contract.

In its third point, Appellant contends the trial court erred in denying its motion to compel arbitration and granting Respondent's motion to stay arbitration because the portion of Section 435.350 rendering arbitration clauses in insurance contracts unenforceable does not apply to Appellant's reinsurance agreement, in that the Liability Risk Retention Act (LRRA) preempts Section 435.350.

## Standard of Review

An appellate court's review of a trial court's denial of a motion to compel arbitration is *de novo*. Sturgeon v. Allied Professionals Ins. Co., 344 S.W.3d 205, 209 (Mo.App. E.D. 2011).

The interpretation of a contract is a question of law. State v. Nationwide Life Ins. Co., 340 S.W.3d 161, 182 (Mo.App. W.D. 2011). The primary rule in interpreting a contract is to ascertain the parties' intent and give effect to that intent. Id. To ascertain the parties' intent, we rely on the plain and ordinary meaning of the words in the contract and consider the document as a whole. Id.

## Discussion

For purposes of clarity, we discuss the points out of the order in which they were presented by Appellant in its brief.

In deciding an appeal from an order refusing to compel arbitration, an appellate court considers three issues: (1) the court must determine whether a valid arbitration agreement exists;

8

(2) if a valid arbitration agreement exists, the court must determine whether the specific dispute falls within the scope of the arbitration agreement; and (3) if a valid arbitration contract exists and if the subject dispute is within the scope of the arbitration provision, then the court must determine whether the arbitration agreement is subject to revocation under applicable contract principles. Johnson v. Vatterott Educational Centers, Inc., 410 S.W.3d 735, 737 (Mo.App. W.D. 2013).[4]

Point II – Whether a Valid Arbitration Agreement Exists

Appellant maintains its contract with MUSIC is not an ordinary insurance contract, but a reinsurance contract and is thus exempt from the prohibition against mandatory arbitration in insurance contracts set forth in Section 435.350 of the Missouri Arbitration Act:

> A written agreement to submit any existing controversy to arbitration or a provision in a written contract, *except contracts of insurance* and contracts of adhesion, to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract. Contracts which warrant new homes against defects in construction and *reinsurance contracts are not "contracts of insurance* or contracts of adhesion" for purposes of the arbitration provisions of this section.

(Emphasis added.) Section 435.350.

If the FRA contract is a true reinsurance agreement, then the arbitration clause is valid. If the FRA contract is not a true reinsurance contract, but rather a contract of insurance only, then the arbitration clause is invalid under Section 435.350 and the trial court's judgment will be affirmed.

---

[4] Whether the arbitration clause is subject to revocation is not at issue in this case.

<u>Is the FRA contract one of insurance or reinsurance?</u>

<u>A. General Law</u>

In an insurance agreement, an insurance company directly insures the holder of the policy of insurance issued by the company. In a reinsurance agreement, an insurance company is indemnified by another insurance company for all or parts of losses suffered by the former insurance company under the contracts of direct insurance it has issued to its policyholders. <u>J.C. Penney Life Ins. Co. v. Transit Cas. Co. in Receivership</u>, 299 S.W.3d 668, 673 (Mo.App. W.D. 2009), citing 14 ERIC MILLS HOLMES & L. ANTHONY SUTIN, HOLMES' APPLEMAN ON INSURANCE 2D § 102.1 (2000). The reinsurer agrees to protect the reinsured company either wholly or partially from risks the reinsured company has undertaken with its policyholders, or original insureds. <u>Id.</u> The direct insurance policies between the reinsured company and its original insured remain in effect at the same time as the reinsurance agreement between the reinsured company and the reinsurer. <u>Id.</u>

A reinsurance contract is purely a contract indemnifying against loss and no action will lie until the loss has been paid. <u>Homan v. Employers Reinsurance Corp.</u>, 136 S.W.2d 289, 296 (Mo. 1939); <u>O'Hare v. Pursell</u>, 329 S.W.2d 614, 620 (Mo. 1959). The difference between contracts of indemnity against loss and contracts of indemnity against liability is that in the former, the insurance company does not become liable until loss has actually been suffered and the amount of the insurance does not become available until the assured has paid the loss. <u>Id.</u> In the latter, the obligation of the insurance company becomes fixed when the liability attaches to the insured. <u>Id.</u>

There are certain identifiers within the plain language of the FRA contract between Appellant and MUSIC which compel us to conclude it is not strictly a reinsurance contract.

10

B. Loss v. Liability

The FRA contract does not merely cover a loss by MUSIC and trigger Appellant's liability for payment only upon the occurrence of a loss. Homan, 136 S.W.2d at 296; O'Hare, 329 S.W.2d at 620. Rather, the FRA contract provides Appellant's liability "shall follow that of [MUSIC]." The FRA contract also provides Appellant's liability under the contract to be "subject in all respect to the terms, conditions, exclusions and limits of liability" of the MUSIC policy with its insureds. The contract does not, by its own terms, merely become liable upon MUSIC's loss. Rather, its terms plainly insert Appellant into and declare its control over the claims asserted against MUSIC's insureds.

C. Control

The FRA contract details the manner in which Appellant may control and participate in claims and litigation involving MUSIC's insureds. The terms of the FRA contract allow Appellant to approve in advance counsel selected to represent MUSIC's insureds in claims made against them; to associate in the defense and control of claims and trials; to retain sole discretion to take over the defense of any claim, suit, or legal proceeding; and to exercise the defense and settlement rights of the insureds. These asserted rights to be involved with, defend, and control litigation and claims asserted against MUSIC's original insureds are similar to the terms of the purported reinsurance agreement in O'Hare, where the reinsurer agreed to be responsible for investigating, defending, and adjusting all claims against and involving the original insureds. See O'Hare, 329 S.W.2d at 621-22; J.C. Penney, 299 S.W.3d at 674. In O'Hare, the reinsurer was authorized to and agreed to do all things it deemed expedient including the commencement, defense and compromise of, or withdrawal from, lawsuits and claims involving the original insureds. O'Hare, 329 S.W.2d at 616-17; J.C. Penney, 299 S.W.3d at 675. Such terms

11

convinced our Supreme Court the contract in O'Hare was of insurance rather than reinsurance, because they went beyond the mere insurance of a loss. We find a similar result is dictated in the instant case, for the same reason.

These terms also fulfill the criteria set forth in Homan to determine whether a contract is truly one of reinsurance or insurance, whereby: (1) the reinsurer agreed to be subject to all of the general and special terms and conditions of the reinsured's underlying policies; (2) the reinsurer contracted for the right to participate jointly with the reinsured in the investigation, adjustment, and settlement of claims; (3) the reinsurer's liability followed and otherwise arose coincident to the reinsured's liability; and (4) the reinsurance was defined as excess and applied only to the liability of the reinsured carrier in excess of certain amounts named. Homan, 136 S.W.2d at 297-99.

In the instant case, the FRA contract provides $2,000,000 per occurrence/claim in excess to MUSIC's $500,000 per occurrence/claim to reach the total stated coverage amount of $2,500,000. MUSIC refers to Appellant as "Excess" in its correspondence and records. The FRA contract provides Appellant's liability "shall follow that of [MUSIC]," and be "subject in all respect to the terms, conditions, exclusions and limits of liability" of the MUSIC policy with its insureds. The terms of the FRA contract allow Appellant to approve in advance counsel selected to represent MUSIC's insureds in claims made against them; to associate in the defense and control of claims and trials; and to retain sole discretion to take over the defense of any claim, suit, or legal proceeding and to exercise the defense and settlement rights of the insureds. All of these examples are analogous to those set forth in Homan that make the contract one of insurance, not reinsurance. Id. at 297-99.

12

Of interest, yet not necessary to our disposition of this appeal, is that in the proceedings *sub judice*, Hurwitz, Appellant's counsel assigned directly to the Pitt family's claims against Respondent, corresponded directly with Respondent's own counsel. Respondent's counsel sent his litigation plan directly to Hurwitz. Hurwitz e-mailed Respondent's counsel and MUSIC's counsel and asked them to provide her with a copy of Respondent's sentencing hearing transcript from his guilty plea. Although in this case we need not look outside the four corners of the FRA contract to determine what kind of insurance agreement it is because its terms are not in any way ambiguous, it is notable Appellant actively put into practice each and every aspect of control and participation it reserved for itself in the FRA contract.

D. Liability to Original Insured

This result leads to Appellant's third-party liability directly to Respondent, the original insured. Respondent is a third-party beneficiary of the FRA contract and thus can maintain an action on the contract. See O'Hare, 329 S.W.2d at 621-22; J.C. Penney, 299 S.W.3d at 674.

Reinsurance contracts may be drafted in such a form and with such provisions as to create a liability on the part of the reinsurer not only to the reinsured insurer but also directly to the original insured. Homan, 136 S.W.2d 289; O'Hare, 329 S.W.2d at 620; First Nat. Bank of Kansas City v. Higgins, 357 S.W.2d 139, 143 (Mo. 1962); J.C. Penney, 299 S.W.3d at 674.

"In fact, in any case where the contract of reinsurance is more than a mere contract of indemnity, and is made for the benefit of the policyholders of the reinsured, and by it the reinsurer assumes the liability of the latter upon its policies, the liability of the reinsurer may be directly enforced by the insured, or by his privies." O'Hare, 329 S.W.2d at 620; First Nat. Bank of Kansas City, 357 S.W.2d at 143.

Ordinarily, the original insured has no interest in the reinsurance. 14 APPLEMAN ON INSURANCE 2D § 102.1; J.C. Penney, 299 S.W.3d at 673. "Indeed, a reinsurance contract 'operates solely as between the reinsurer and the reinsured. It creates no privity between the original insured and the reinsurer.'" J.C. Penney, 299 S.W.3d at 673-74, quoting O'Hare, 329 S.W.2d at 620. "This is because the contract of insurance and the contract of reinsurance are totally distinct and unconnected." J.C. Penney, 299 S.W.3d at 674. "An ordinary contract of reinsurance is one of indemnity against loss, and no action will lie until the loss has been paid." Id. "The reinsurer is solely and exclusively liable to the reinsured and has no contractual obligation or liability to the original insured." Id.

Nevertheless, barring any statutory restrictions against it, a reinsurance contract may be drafted in such a way as to make the reinsurer liable to both the reinsured company and the original insured. Id. If the reinsurer assumes the liability of the reinsured company on its policies, then the policyholders, or their privies, may directly enforce this liability against the reinsurer. Id. As the Missouri Supreme Court explained in O'Hare:

> '[W]here, in reinsuring risks for which policies are outstanding, reinsurer contracts with reinsured to assume the policies and to pay the holders thereof all such sums as reinsured may become liable to pay, the persons to whom these original policies are payable acquire a direct right of action against reinsurer, and may sue in their own names and recover on the contract of reinsurance.'

Id.

E. Public Policy

Reinsurance contracts are agreements negotiated between insurers. Therefore, both parties to the agreement are presumed to have a degree of sophistication regarding insurance contracts. As a result, courts will generally enforce the written terms contained in reinsurance certificates and treaties without reference to contra-insurer rules of construction protecting

14

unsophisticated insureds, such as Section 435.350.  See, Charles F. Corcoran, III, Reinsurance Litigation: A Primer, 16 W. New Eng. L. Rev. 41, 45-46 (1994).  However, with regard to general insurance policies, Missouri's prohibition of mandatory arbitration clauses in insurance contracts is for the protection of the insured.  Sturgeon, 344 S.W.3d at 217.  The FRA contract is not a mere reinsurance policy between MUSIC and Appellant, but rather a general insurance policy upon which Respondent can bring an action against Appellant; namely, his claims for bad faith refusal to settle, bad faith refusal to defend, and breach of fiduciary duty; and Section 435.350 prevents Appellant from enforcing its arbitration clause against him.

F. Conclusion

The terms of the FRA contract clearly indicate that despite its moniker, the contract is not strictly a reinsurance agreement, excusing it from the prohibition against mandatory arbitration clauses set forth in Section 435.350.  It is not a mere contract of indemnity against loss but is, in fact, a contract of indemnity against liability.  Homan, 136 S.W.2d at 299.  By its terms it provides excess insurance and is, in essence, a co-insurer for MUSIC's insureds.  The contract does not simply operate to provide reinsurance between two sophisticated insurance companies, MUSIC and Appellant.  As such, it is an insurance contract and its mandatory arbitration clause is unenforceable and cannot be enforced against Respondent under Section 435.350. Accordingly, Point II is denied.

Point I − Whether Dispute within Scope of Arbitration Agreement

Because we have found the arbitration agreement cannot be enforced against Respondent for the reasons set forth *supra* in our discussion of Point II, our analysis could end here. However, we further find Respondent's third-party beneficiary claims do not fall within the scope of the arbitration clause.  Johnson, 410 S.W.3d at 737.

15

Appellant maintains Respondent's third-party beneficiary claims are within the scope of the arbitration clause because the language of the arbitration clause limiting arbitration to disputes between the parties does not exclude third-party beneficiary claims.

The arbitration clause in the FRA contract provides:

> If any dispute should arise between the "Reinsured" [MUSIC] and the "Reinsurer" [Appellant] with reference to the interpretation of this Agreement or their rights with respect to any transaction involved . . . such dispute, upon the written request of either party, shall be submitted to three arbitrators, one to be chosen by each party, and the third by the two so chosen.

Thus, by the plain language of the arbitration clause, disputes subject to arbitration are limited to disputes between MUSIC, the reinsured, and Appellant, the reinsurer. When interpreting the language of an insurance contract, appellate courts give the language its plain meaning. Shahan v. Shahan, 988 S.W.2d 529, 535 (Mo.banc 1999). The plain or ordinary meaning is the meaning that the average layperson would understand. Id.

Respondent's claims against MUSIC and Appellant for bad faith refusal to settle, bad faith refusal to defend, and breach of fiduciary duty are not within the scope of nor covered by this clause because these claims are not a dispute between Appellant and MUSIC. Moreover, just because the arbitration clause does not explicitly exclude third-party claims against MUSIC or Appellant does not mean they are implicitly included within the scope of the arbitration clause, as Appellant asserts. Such an argument runs contrary to basic tenets of contractual interpretation. Courts are not permitted to create ambiguities in order to distort the language of an unambiguous policy. Shahan, 988 S.W.2d at 535. In the absence of the existence of an ambiguity, appellate courts must enforce the policy as written, giving the language of the policy its ordinary meaning. Trans World Airlines, Inc. v. Associated Aviation Underwriters, 58 S.W.3d 609, 622 (Mo.App. E.D. 2001).

16

"In interpreting an insurance contract, we must keep in mind that insurance policies are contracts; thus, the rules of contract construction apply." Drury Co. v. Missouri United School Ins. Counsel, 455 S.W.3d 30, 36 (Mo.App. E.D. 2014). "The words of a policy must be given their plain and ordinary meaning consistent with the reasonable expectation and objectives of the parties, unless it is obvious that a technical meaning was intended." Id. "We read insurance policies as a whole to determine the parties' intent, and give effect to this intent by enforcing the contract as written." Id. "We must endeavor to give each provision a reasonable meaning and to avoid an interpretation that renders some provisions useless or redundant." Id. Appellant's argument that the absence of language excluding third-party beneficiary claims from the mandatory arbitration clause implies their inclusion without any words to that effect in the FRA agreement fails as a matter of statutory interpretation.

For these reasons, Point I is denied.

### Point III – Preemption

In its third point, Appellant contends the portion of Section 435.350 rendering arbitration clauses in insurance contracts unenforceable does not apply to Appellant's reinsurance agreement because the LRRA preempts Section 435.350. This very issue has recently been addressed and decided by this Court contrary to Appellant's position. Appellant's status as a risk retention group does not excuse it from Section 435.350's prohibition of arbitration clauses in contracts of insurance, nor does the LRRA provide preemption on this basis. Sturgeon, 344 S.W.3d at 217. The LRRA allows risk retention groups to operate as insurance groups by entering into insurance contracts, but the states' interpretation of those insurance contracts is not part of the preemption provided by the LRRA. Sturgeon, 344 S.W.3d at 216. In Sturgeon, we found indisputable evidence of this in the LRRA itself:

17

Nothing in this chapter shall be construed to affect either the tort law or the law governing the interpretation of insurance contracts of any State, and the definitions of liability, personal risk liability, and insurance under any State law shall not be applied for the purposes of this chapter, including recognition or qualification of risk retention groups or purchasing groups.

15 U.S.C. Section 3901(b); Sturgeon, 344 S.W.3d at 216.

Section 435.350 of the Missouri Arbitration Act prohibiting mandatory arbitration clauses in insurance contracts does not regulate Appellant's operation as a risk retention group. Sturgeon, 344 S.W.3d at 216. The purpose of Section 435.350 of the Missouri Arbitration Act is to regulate the business of insurance. Id. The Missouri statute was enacted for the purpose of regulating insurance in that it was designed to regulate the operation of an insurance contract. Id.

For the foregoing reasons, Point III is denied.

Conclusion

The trial court's order and judgment is affirmed.[5]


_____
SHERRI B. SULLIVAN, P.J.


Kurt S. Odenwald, J., and
Lisa P. Page, J., concur.

---

[5] Appellant's motion to strike the supplemental legal file is denied.